# IN THE SUPREME COURT OF IOWA

No. 55 / 05-0198

Filed August 11, 2006

**STATE OF IOWA,**

Appellee,

vs.

**JEFFREY MICHAEL NITCHER,**

Appellant.

_____

Appeal from the Iowa District Court for Cerro Gordo County, James M. Drew, Judge.

Defendant appeals his conviction for drug-related offenses. **AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS.**

Linda Del Gallo, State Appellant Defender, and Theresa R. Wilson, Assistant State Appellant Defender, for appellant.

Thomas J. Miller, Attorney General, Kristin Guddall, Assistant Attorney General, and Paul L. Martin, County Attorney, for appellee.

**WIGGINS, Justice.**

A jury found Jeffrey Nitcher guilty of aiding and abetting or conspiring to manufacture a controlled substance, possession of products with the intent to manufacture a controlled substance, and failure to affix a controlled substance tax stamp. On appeal, he claims his trial counsel was ineffective for failing to challenge a warrantless search of a residence where he was an overnight guest. Our review of the record indicates that his trial counsel was not ineffective because the officers conducted the warrantless search with probable cause and exigent circumstances. Nitcher also complains there was not sufficient evidence to support his convictions. Again, our review of the record indicates sufficient evidence supported Nitcher's conviction on all three charges. We therefore affirm his convictions and sentences.

Nitcher further asserts the district court used the sufficiency-of-the-evidence standard rather than the weight-of-the-evidence standard when it overruled Nitcher's motion for new trial. Because the district court did use an incorrect standard, we reverse the district court's ruling denying Nitcher's motion for new trial and remand the case to the district court to rule on his motion for new trial under the correct weight-of-the-evidence standard.

## I. Background Facts and Proceedings.

During the early morning hours of December 30, 2003, Cerro Gordo County deputy sheriff Ryan Carroll was patrolling an area known as Winnebago Heights when he detected the odor of ether in the air. He drove around the area, parked his car, and walked until he was able to determine that the odor was coming from a specific residence. Before entering the property, Carroll called his lieutenant, George Fountas, for assistance.

When Fountas arrived, he and Carroll approached the house and knocked on the east door. A person eventually came to the door, but did not open it. A male voice from within the residence asked who was there. Fountas informed the person they were from the sheriff's office. The officers then heard the person shuffle away from the door and heard noises that sounded like the person was running toward the garage. Fountas stayed at the door while Carroll walked around the garage toward the north and west side of the residence in case someone attempted to leave. Carroll also called for backup. At some point, the officers called the fire department due to the potential fire hazard.

As Carroll walked toward the garage, he began to detect a very strong odor of anhydrous ammonia. He also smelled a moderately strong odor of ether as he walked toward the north side of the building. When he arrived at the northwest corner of the residence, he noticed the west side of the building had several windows and a doorway that were boarded up. While standing in the northwest corner, Carroll continued to hear the shuffling of a person or persons in the garage.

After the backup officers arrived on the scene, Carroll and Fountas returned to the east door of the residence and knocked on the door again. Lloyd Pierce eventually opened the door. Pierce was wearing sleeping attire. The officers told Pierce they were at his door because of the chemical odors. Pierce told the officers he was the owner of the residence, he had been sleeping, and he was not aware of any chemical odors. Carroll observed that Pierce appeared to be very anxious. Fountas asked Pierce for consent to search the residence, which he gave and then withdrew. The officers led Pierce out of the residence.

Concerned for the safety of any other person inside the residence, the officers asked Pierce if there were others in the residence. Pierce told them his wife and children were inside. Because the officers felt the odor of ether in the entryway made it too dangerous to enter the residence, Carroll left the premises to retrieve air-purifying respirators so that they could enter the residence and look for anyone else inside. Fountas then yelled inside the residence for anybody there to come out and three individuals did so. The officers took Susan Payne, Larry Hull, and Nitcher into protective custody and placed them inside the entryway of the residence.

When Carroll returned with the respirators, he and Fountas put their respirators on and entered the residence. They testified their purpose for entering the residence was to look for other people inside. They only looked in spaces big enough for a person to be in. When the officers opened the door to the garage, they immediately noticed a white cloud or haze and an odor of ether strong enough to overpower their respirators. They backed out of the garage for safety reasons and went outside the residence. They did not find any other persons in the residence.

An officer placed the four individuals in his patrol car and transported them to the station. While transporting these individuals to the station, the officer noticed a smell of ether and anhydrous ammonia in the vehicle. Before being processed at the station, the fire department decontaminated these four individuals.

While other officers secured the residence, Carroll and Cerro Gordo County chief deputy sheriff David Hepperly obtained a search warrant for the premises. Pursuant to the warrant, Carroll, Fountas, and other officers searched the exterior of the residence and property. Hepperly and Mason City police investigator David Tyler, who were state-certified for the

investigation of methamphetamine labs, searched the interior of the residence wearing self-contained breathing apparatuses and fireproof suits. They entered the garage and opened the doors to ventilate the area. Eventually the other officers entered the house to participate in the search of the residence.

During the search of the garage area, officers found two glass pie plates containing red or pink and off-white powdery substances, a plastic container with an off-white powdery substance, and a white cloth shut under the lid of the container in the same area. The substance in the plastic container appeared moist. The room in which the officers found these items was separated from an attached shed to the garage by a sliding glass door that had been closed with a screw in the doorjamb. The room contained the odor of ether. Additionally, the officers observed moist off-white and pink or red substances between cracks in the floorboards and on the doorsill to the room. The officers found other items as well, including a foam plate with pink and white substances, a coffee filter with residue, a plastic pitcher with red residue, and plastic tubing with residue. The officers found no tax stamps for the substances in the plastic container or in the floorboards, which were later determined to contain methamphetamine.

In Pierce's bedroom, the officers found a bottle of Heet and a nearly empty one-gallon container of acetone, common ingredients in the manufacture of methamphetamine. In another bedroom, officers found a pair of blue jeans, a sweatshirt, and coffee filters. The clothes smelled of ether and a pocket in the jeans contained an identification card issued to Nitcher. Nitcher had been staying at the residence for a few days because

he had an argument with his girlfriend. The officers also found muriatic acid in a washroom.

Some of the items found outside the residence included a small propane tank with an altered fitting and a severed garden hose. This setup would allow a person to draw the anhydrous ammonia that was in the tank to another container using the hose. There was also a burn pile, which contained rusted burnt cans of what the officers believed to be starting fluid and camp fuel. The starting fluid cans had holes punched in them in order to depressurize the ether.

The officers sent several of the items seized during the search to the division of criminal investigation lab for testing. The analysis revealed all the items contained pseudoephedrine, most contained methamphetamine and CMP (a by-product created by the metal-ammonia reduction method of methamphetamine manufacture, the metal here likely being lithium), some contained lithium salt, and one contained triprolidine. The substance found in the plastic container weighed 10.57 grams and contained methamphetamine, pseudoephedrine, and CMP. The substance found on one glass pie plate contained pseudoephedrine and the substance found on the other glass pie plate contained pseudoephedrine and triprolidine.

The items tested were consistent with the various steps of the lithium-ammonia reduction method of methamphetamine manufacture. The residue on the pie plates was consistent with the preparation of the precursor; the substances found on the foam plate were consistent with solid waste from the solvent phase; the residue on the plastic tubing was consistent with the bubbling process; and the white cloth in the plastic container as well as the residue on the plastic pitcher were consistent with the filtering stage. Additionally, the acetone was consistent with the

process used to whiten the final product. The lab found Hull's fingerprint on both pie plates and Nitcher's fingerprint on one pie plate. The lab found no fingerprints on the plastic container. The analysts were unable to determine when the substances were generated or when the prints were left on the objects.

The State charged Hull, Nitcher, Payne, and Pierce with: (1) conspiracy to manufacture a schedule II controlled substance in violation of Iowa Code sections 124.401(1) and 124.401(1)(*b*) (2003), a class "B" felony; (2) possession of products with the intent to manufacture a controlled substance in violation of Iowa Code section 124.401(4), a class "D" felony; and (3) failure to affix a controlled substance tax stamp in violation of Iowa Code sections 453B.1(3)(*a*) and 453B.12, a class "D" felony. Nitcher entered a plea of not guilty.

Nitcher filed a motion to suppress the evidence seized by the officers claiming the issuance of the search warrant lacked probable cause and failed to identify the places searched by the officers. The court overruled the motion. Nitcher filed a renewed motion to suppress the evidence seized by the officers pursuant to the warrant, claiming the basis for the renewed motion did not become evident until he took the depositions of the State's witnesses. The court denied the renewed motion.

Nitcher and Hull proceeded to a joint jury trial. Both defendants moved for directed verdicts of acquittal at the close of the State's case regarding count I as to conspiracy and counts II and III as to possession. The court overruled the motions. The jury found Nitcher and Hull guilty of aiding and abetting or conspiring to manufacture a controlled substance, possession of products with the intent to manufacture a controlled substance, and failure to affix a controlled substance tax stamp.

Hull filed a motion for new trial claiming the verdict was contrary to the law or evidence regarding possession, conspiracy, and intent to manufacture or deliver. Hull also filed a motion in arrest of judgment on the same day claiming there was insufficient evidence to support the judgment as to the link between the manufacture of a controlled substance and his presence in the house or his fingerprint on an object found in the house. He also claimed the court should have sustained his motion to suppress.

At the sentencing hearing, Nitcher joined in the motions filed by Hull. The court overruled the motions. The court then sentenced Nitcher. Nitcher appeals.

## II. Issues.

On appeal we must consider: (1) whether Nitcher was denied effective assistance of original and substitute counsel and a fair trial as guaranteed by the United States Constitution and the Iowa Constitution; (2) whether the evidence was insufficient as a matter of law to convict Nitcher of aiding and abetting or conspiring to manufacture methamphetamine, possession of products with intent to manufacture methamphetamine, and failure to affix a drug tax stamp; and (3) whether the district court erred by applying an incorrect standard in overruling Nitcher's motion for new trial.

## III. Discussion and Analysis.

*A. Nitcher's claim of ineffective assistance of counsel.*

Nitcher claims original and substitute counsel did not render effective assistance as guaranteed by the United States Constitution and the Iowa Constitution. Claims involving the ineffective assistance of counsel have their basis in the Sixth Amendment of the United States Constitution and thus are examined de novo. *State v. Wills*, 696 N.W.2d 20, 22 (Iowa 2005).

Although these claims are typically preserved for postconviction relief actions, "we will address such claims on direct appeal when the record is sufficient to permit a ruling." *Id.*

Nitcher claims his trial counsel was ineffective for failing to challenge the warrantless search of the residence. He argues there is no applicable exception to the warrant requirement permitting Carroll and Fountas to enter the residence without a warrant. He concludes that because the warrantless search cannot be justified, the evidence obtained pursuant to the search warrant is tainted and inadmissible.

"In order for a defendant to succeed on a claim of ineffective assistance of counsel, the defendant must prove: (1) counsel failed to perform an essential duty and (2) prejudice resulted." *Id.* In order to satisfy the first element, " 'counsel's performance is measured against the standard of a reasonably competent practitioner with the presumption that the attorney performed his duties in a competent manner.' " *State v. Doggett,* 687 N.W.2d 97, 100 (Iowa 2004) (citations omitted). Prejudice exists where " 'there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different.' " *Wills,* 696 N.W.2d at 22 (citations omitted).

The Fourth Amendment assures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourteenth Amendment of the United States Constitution makes the Fourth Amendment binding on the states. *State v. Freeman,* 705 N.W.2d 293, 297 (Iowa 2005). In addition, article I, section 8 of the Iowa Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be

violated." Iowa Const. art. I, § 8.  Nitcher has not asked us nor have we found a basis to distinguish the protection afforded by the Iowa Constitution from that afforded by the federal constitution under the facts of this case.  Therefore, our analysis of the search issue will apply equally to both the state and federal constitutional grounds raised by Nitcher.  *State v. Simmons*, 714 N.W.2d 264, 271 (Iowa 2006).

Initially, it is necessary to decide if Nitcher had a legitimate expectation of privacy in the premises searched, both subjectively and objectively.  *State v. Lovig*, 675 N.W.2d 557, 562-63 (Iowa 2004).  We have said it is apparent the Fourth Amendment protects the physical entry of a person's home.  *Id.* at 563.  We have acknowledged a legitimate expectation of privacy may extend to protect an overnight guest in the host's home, but we have also found no legitimate expectation of privacy if a guest is there simply to conduct a business transaction.  *Id.*  Nitcher had been staying at the residence for a few days because of an argument he had with his girlfriend.  As Nitcher and the State agree, Nitcher had a legitimate expectation of privacy in view of his status as an overnight guest at the residence.

Because a legitimate expectation of privacy existed, absent a recognized exception to the search warrant requirement, searches and seizures conducted without a warrant are per se unreasonable.  *Freeman*, 705 N.W.2d at 297.  These exceptions include " 'searches based on consent, plain view, probable cause coupled with exigent circumstances, searches incident to arrest, and those based on the emergency aid exception.' "  *Id.* (citation omitted).  The State must prove by a preponderance of the evidence that such a recognized exception applies.  *Id.*  In making this determination,

we must assess a police officer's conduct based on an objective standard. *Id.*

The State claims the officers had probable cause coupled with exigent circumstances to enter the property near the garage area. There is probable cause to conduct a search if, under the totality of the circumstances, "a person of reasonable prudence would believe that evidence of a crime might be located on the premises to be searched." *State v. Davis*, 679 N.W.2d 651, 656 (Iowa 2004).

Carroll knew ether is one of the necessary ingredients to make methamphetamine. The detection of the odor of ether coming from the residence gave Carroll and Fountas reason to approach the door of the residence to investigate the smell. *See State v. Dickerson,* 313 N.W.2d 526, 532 (Iowa 1981) (stating officers conducting an investigation did not invade the defendant's reasonable expectation of privacy by going to a door that various members of society may use to call on the home in their personal or business pursuits). After knocking and identifying themselves as police officers, the officers heard the person at the door shuffle away from the door and run toward the garage. Only then did Carroll proceed to the area by the garage. Although Carroll walked across the property to get to the garage area, under these circumstances it was reasonable for him to do so in order to make contact with the person he heard at the door run toward the garage, in case that person attempted to exit the residence through a door near the garage. *Cf. State v. Lewis,* 675 N.W.2d 516, 527 (Iowa 2004) (stating "[i]f the officer had attempted to contact [the defendant] at his front door and received no response, the invasion of the curtilage may not have violated [the defendant's] Fourth Amendment rights"); *State v. Breuer*, 577 N.W.2d 41, 49 (Iowa 1998) (noting some courts have found if no one

responds to an officer's knock, it does not violate the Fourth Amendment for the officer to walk around the residence to look for another door to interview a person). While walking toward the garage, Carroll detected the distinct odor of anhydrous ammonia and heard the shuffling of a person or persons in the garage.

After Pierce opened the door, the officers detected a strong odor of ether in the entryway. They felt it was so strong that it was unsafe to enter the residence without wearing their respirators. They also noted Pierce appeared anxious and denied the obvious presence of the chemical odor. Pierce also told the officers other persons were in the residence, including his wife and children.

Under the totality of the circumstances, which included the odors of ether and anhydrous ammonia, the sound of a person running from the front door, the shuffling of the person or persons in the garage, Pierce's anxiousness, and his denial of the obvious presence of chemical odors, the officers had probable cause to believe the occupants of the residence were engaged in criminal activity related to the manufacture of methamphetamine. *See Simmons*, 714 N.W.2d at 273 (stating "[b]ased on [an officer's] training and experience, coupled with the distinct odor of anhydrous ammonia and the lack of household uses for it, we find the officers had probable cause to believe the occupants of the apartment were engaged in criminal activity"); *see also Kleinholz v. United States*, 339 F.3d 674, 677 (8th Cir. 2003) (explaining law enforcement's detection of the odor of ether, "a substance known to be used in the manufacture of methamphetamine," may alone establish probable cause).

"Exigent circumstances usually include 'danger of violence and injury to the officers or others; risk of the subject's escape; or the probability that,

unless taken on the spot, evidence will be concealed or destroyed.' " *State v. Holtz*, 300 N.W.2d 888, 893 (Iowa 1981) (citation omitted).  In *Simmons*, we noted an exigency posing a threat of danger to others allows officers to "perform a limited search to remove the immediate risk."  714 N.W.2d at 273.  We found "[t]he volatile nature of and the dangers created by methamphetamine labs can be exigent circumstances justifying an immediate limited search of premises harboring such a lab," and we recognized various cases have upheld such searches to eliminate these potential hazards where officers had probable cause to believe an ongoing methamphetamine lab existed.  *Id.*; *see also Kleinholz*, 339 F.3d at 677 (explaining the volatile nature of methamphetamine labs presents exigent circumstances justifying an immediate limited search where law enforcement smelled ether).

The record demonstrates exigent circumstances existed to allow the officers to do a limited search of the premises to eliminate the dangers associated with the manufacture of methamphetamine and to determine if other persons were on the premises who might be exposed to those dangers. The level of the chemical odor not only required the officers to wear respirators while inside the residence, but also caused them to call the fire department to the scene.  When the officers entered the residence, they did so only to see if any dangers associated with the manufacture of methamphetamine were present and to make sure no other persons were still in the residence.  They only searched areas big enough to hold a person. They did not open any drawers or search any areas where a person would not fit.  They left the residence when they were satisfied no immediate danger existed and no more persons were in the residence.

Thus, Carroll and Fountas's limited search of the residence was justified based on probable cause and exigent circumstances. The applicability of this exception to the warrant requirement means Nitcher's trial and substitute counsel were not ineffective for failing to challenge the warrantless entry. *See Wills*, 696 N.W.2d at 24 (finding trial counsel was not ineffective for failing to raise an issue with no merit). Accordingly, Nitcher's ineffective-assistance-of-counsel claim must fail. *See State v. Liddell*, 672 N.W.2d 805, 809 (Iowa 2003) (recognizing failure to prove either a breach of an essential duty or prejudice is fatal to ineffective-assistance-of-counsel claims).

> *B. Nitcher's claim the evidence was insufficient as a matter of law to convict him of aiding and abetting or conspiring to manufacture methamphetamine, possession of products with the intent to manufacture methamphetamine, and failure to affix a drug tax stamp.*

Our review of Nitcher's motion for judgment of acquittal requires us to examine the sufficiency of the evidence supporting the jury's guilty verdict. *State v. Bash*, 670 N.W.2d 135, 137 (Iowa 2003). " 'We review challenges to the sufficiency of the evidence supporting a guilty verdict for correction of errors at law' " and " '[w]e will uphold a verdict if substantial record evidence supports it.' " *Id.* (citation omitted). Evidence is considered substantial if, viewed in the light most favorable to the State, it can convince a rational jury that the defendant is guilty beyond a reasonable doubt. *Id.* "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury was free to reject certain evidence, and credit other evidence." *State v. Anderson*, 517 N.W.2d 208, 211 (Iowa 1994). Because Nitcher does not assert the law in the instructions was incorrect, but rather the evidence did not support the jury's finding, we will examine

his claims in view of the instructions the district court gave to the jury. *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006).

In regards to count I, Nitcher claims the evidence was not sufficient to prove he entered into an agreement with anyone to manufacture methamphetamine or that he knowingly and actively participated or encouraged such. The district court instructed the jury that the State relied on the alternative theories of aiding and abetting as well as conspiracy to prove its case under count I.

In particular, the jury was instructed that the crime of conspiracy to manufacture a controlled substance required the State to prove the following elements:

1. On or about the 30th day of December, 2003, [Nitcher] agreed with one or more other persons:

   a. that one or more of them would manufacture a controlled substance, or

   b. attempt to manufacture a controlled substance.

2. [Nitcher] entered into the agreement with the intent to promote or facilitate the crime of manufacturing a controlled substance.

3. [Nitcher] or the other person or persons committed an overt act.

4. The other person or persons were not law enforcement agents investigating the offense or assisting law enforcement agents in the investigation when the conspiracy began.

The court further instructed the jury "[t]he State must prove [Nitcher] and the other person or persons came to a mutual understanding the offense would be attempted or committed."

As to the crime of aiding and abetting the manufacture of a controlled substance, the jury was instructed that the State was required to prove the following elements: (1) "On or about the 30th day of December, 2003,

[Nitcher] aided and abetted the manufacture of methamphetamine"; and (2) "[Nitcher] knew that the substance he aided and abetted in manufacturing was methamphetamine." The court further instructed the jury:

> "Aid and abet" means to knowingly approve and agree to the commission of a crime, either by active participation in it or by knowingly advising or encouraging the act in some way before or when it is committed. Conduct following the crime may be considered only as it may tend to prove a defendant's earlier participation. Mere nearness to, or presence at, the scene of the crime, without more evidence, is not "aiding and abetting." Likewise, mere knowledge of the crime is not enough to prove "aiding and abetting."

Our review of the record causes us to conclude substantial evidence supports the jury finding of guilt as to the crime of conspiracy to manufacture a controlled substance. Nitcher does not dispute methamphetamine was manufactured at some time at the residence. Additionally, the facts that Nitcher's clothing smelled of ether, the proximity of the coffee filters to his clothes, and Nitcher's fingerprint on a pie plate that contained pseudoephedrine and triprolidine support the jury's finding he was involved with the process. The evidence of Nitcher's fingerprint on the pie plate not only supports the jury's finding he was involved in the process to manufacture methamphetamine, but also permits the inference of an agreement. *Cf. State v. Speicher*, 625 N.W.2d 738, 742-43 (Iowa 2001) (explaining an agreement to sustain a conviction for conspiracy may be inferred from proof of involvement in the methamphetamine-manufacturing process). The jury could believe Nitcher entered into such an agreement with Hull, as his fingerprint was also on the pie plate. Finally, other manufacturing-related items found by the officers in the same area as the pie plate, the chemical odors, and the moistness of the substances found could lead a jury to find the methamphetamine-making process had occurred recently.

This same evidence also supports the jury's finding that Nitcher knowingly participated in or encouraged the manufacture of methamphetamine; thus, there is substantial evidence to support a conviction on the alternate theory of aiding and abetting. *See State v. Williams,* 674 N.W.2d 69, 71 (Iowa 2004) (stating if alternative theories of culpability are submitted to the jury and a general verdict is returned, all theories must be supported by substantial evidence).

In regards to count II, Nitcher claims under the pre-amended version of Iowa Code section 124.401(4),[1] the statute governing this charge, there is no evidence that he intended to use any precursors to manufacture methamphetamine. Nitcher also contends the evidence failed to show he constructively possessed the precursors.

The district court instructed the jury that the crime of possession of products with the intent to manufacture a controlled substance required the State to prove the following elements:

> 1. That on or about December 30, 2003, [Nitcher] knowingly possessed any product containing any of the following: ethyl ether, anhydrous ammonia, red phosphorous, lithium, iodine, thionyl chloride, chloroform, palladium, perchloric acid, tetrahydrofuran, ammonium chloride, magnesium sulfate, or pseudoephedrine.

> 2. That [Nitcher] possessed any of the above with the intent to manufacture a controlled substance, namely methamphetamine.

The court further instructed the jury:

> The word "possession" includes actual as well as constructive possession, and also sole as well as joint possession.

> A person who has direct physical control of something on or around his person is in actual possession of it.

---

[1] *See* 2004 Iowa Acts ch. 1057, § 1 (replacing the phrase "intent to use the product" with the phrase "intent that the product be used").

A person who is not in actual possession, but who has knowledge of the presence of something and has the authority or right to maintain control of it either alone or together with someone else, is in constructive possession of it.

If one person alone has possession of something, possession is sole. If two or more persons share possession, possession is joint.

"Unlawful possession of a controlled substance requires proof that the defendant: (1) exercised dominion and control over the contraband, (2) had knowledge of its presence, and (3) had knowledge that the material was a controlled substance." *Bash*, 670 N.W.2d at 137. Constructive possession may not be inferred from a defendant's sharing of the premises with others; such possession must be established by other proof, such as

incriminating statements made by the defendant, incriminating actions of the defendant upon the police's discovery of the controlled substance among or near the defendant's personal belongings, the defendant's fingerprints on the packages containing the controlled substance, and any other circumstances linking the defendant to the controlled substance.

*Id.* at 138.

Evidence supporting the jury's finding that Nitcher was in possession of products with the intent to manufacture a controlled substance includes Nitcher's presence in a residence emanating odors of ether and anhydrous ammonia, clothing belonging to Nitcher that smelled of ether, coffee filters found in close proximity to the clothing, and Nitcher's fingerprint on a pie plate that contained pseudoephedrine and triprolidine. The odors and moistness of the substances found indicate the process had occurred recently. Nitcher's clothing containing an ether smell and his fingerprint on the pie plate containing pseudoephedrine constitutes substantial evidence to establish the possession link between him and the products when viewed in the context of the other evidence in this case. *See State v. Heuser*, 661

N.W.2d 157, 166 (Iowa 2003) (finding a defendant possessed precursors with the intent to manufacture methamphetamine based on the sum of facts).

The State was also required to prove Nitcher himself intended to manufacture methamphetamine. *See State v. Truesdell*, 679 N.W.2d 611, 617-19 (Iowa 2004) (examining the legislative change to section 124.401(4) and concluding, in cases where the pre-amended version applies, "this statute required *the defendant* intend to use the product to manufacture a controlled substance" (emphasis added)). Here, Nitcher's clothing smelled of ether and was found in close proximity to coffee filters. This evidence coupled with the burn pile that contained punctured cans of starting fluid support the jury's finding that he intended to manufacture methamphetamine. Likewise, Nitcher's fingerprint on the pie plate that contained pseudoephedrine, which was consistent with the preparation of the precursor in methamphetamine manufacture, support such intent. All the items tested by the division of criminal investigation contained pseudoephedrine. Again, the odors and moistness of the substances found indicate the process had occurred recently. When viewed in the context of the other evidence in this case, there was substantial evidence to support the jury's finding that Nitcher himself intended to use the products to manufacture methamphetamine. *See Heuser*, 661 N.W.2d at 166 (finding intent to manufacture methamphetamine from facts that circumstantially proved such intent).

In regards to count III, Nitcher claims the evidence failed to show he constructively possessed the methamphetamine, so he had no duty to affix a drug tax stamp. In this count, the crime of a drug tax stamp violation required the State to prove the following elements:

1. On or about the 30th day of December, 2003, [Nitcher] knowingly possessed a taxable substance as defined in [another instruction].

2. [Nitcher] possessed seven or more grams of the taxable substance.

3. The taxable substance that [Nitcher] possessed did not have permanently affixed to it a stamp, label or other official indication of payment of the state tax imposed on the substance.

The district court further instructed the jury that a "taxable substance" is defined as "a controlled substance, a counterfeit substance, a simulated controlled substance, or marijuana, or a mixture of materials that contains a controlled substance, counterfeit substance, simulated controlled substance or marijuana."

The evidence that Nitcher's clothing contained an ether smell and his fingerprint was on the pie plate containing pseudoephedrine constitutes substantial evidence to establish the connection between him and the products. In the same area as the pie plates, there was an odor of ether, the plastic container of methamphetamine, and methamphetamine between cracks in the floorboards. The odors and moistness of the substances found indicate the process had occurred recently. This constitutes substantial evidence to support the jury's finding as to the possession link between Nitcher and the methamphetamine when viewed in the context of the other evidence in this case. *Cf. State v. Webb,* 648 N.W.2d 72, 81 (Iowa 2002) (recognizing possession is a necessary component of a drug tax stamp charge, and inferences of constructive possession must be drawn from facts that "have a 'visible, plain, or necessary connection' with" such possession (citation omitted)). Accordingly, there was substantial evidence to support the jury's finding of guilt as to the drug tax stamp violation.

Therefore, substantial evidence supported the jury's finding that Nitcher was guilty of conspiracy to manufacture a controlled substance, possession of products with the intent to manufacture a controlled substance, and failure to affix a drug tax stamp.

*C. Nitcher's claim the district court erred by applying an incorrect standard in overruling his motion for new trial.*

"The district court has broad discretion in ruling on a motion for new trial," and thus our review in such cases is for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). A court may grant a new trial where a verdict rendered by a jury is contrary to law or evidence. *Id.* at 201. We have held the phrase " 'contrary to . . . evidence' " means " 'contrary to the weight of the evidence.' " *Id.* (citations omitted). Unlike the sufficiency-of-the-evidence analysis, the weight-of-the-evidence analysis is much broader in that it involves questions of credibility and refers to a determination that more credible evidence supports one side than the other. *Id.* at 202.

The district court overruled Nitcher's motion for new trial stating:

> As I stated during Mr. Hull's hearing, these are essentially a reassertion of the same motions made during trial and for the same reason they are rejected. Mr. Nitcher, the standard here is whether there was evidence from which a jury could find you guilty. The issue is not whether I agree or disagree with that verdict, and I have concluded that there is sufficient evidence to support the verdicts arrived at. So the motion -- or motions, rather, are denied.

The court's reference to Hull's and Nitcher's motions for directed verdicts of acquittal during the trial where the court used the sufficiency-of-the-evidence standard indicates the court did not engage in any weighing of the evidence or consideration of credibility. *See State v. Scalise*, 660 N.W.2d 58, 66 (Iowa 2003) (finding a court used the sufficiency-of-the-evidence

standard based upon its use of certain language in its ruling, and noting an absence of an independent evaluation of the evidence and determinations of witness credibility).

In its brief, the State agrees the district court erred on this matter. Accordingly, we must reverse the district court's ruling denying Nitcher's motion for new trial and remand the case to the district court to rule on his motion for new trial under the correct weight-of-the-evidence standard. *See State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998).

## IV. Disposition.

Because the officers conducted the warrantless search of the residence where Nitcher was staying with probable cause and exigent circumstances, Nitcher's trial counsel was not ineffective for failing to challenge the search. Additionally, there was sufficient evidence to support the jury's guilty verdict on the charges of aiding and abetting or conspiring to manufacture a controlled substance, possession of products with the intent to manufacture a controlled substance, and failure to affix a controlled substance tax stamp. We do find, however, the district court improperly used the sufficiency-of-the-evidence standard rather than the weight-of-the-evidence standard in ruling on Nitcher's motion for new trial. Consequently, we affirm the convictions but remand the case to the district court to rule on the motion for new trial under the correct weight-of-the-evidence standard.

**AFFIRMED IN PART, REVERSED IN PART, AND CASE REMANDED WITH DIRECTIONS.**