# IN THE COURT OF APPEALS OF IOWA

No. 21-1426
Filed September 27, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**MARK DANIEL MASH,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Dallas County, Michael Jacobsen,

Judge.


        Mark Mash appeals his convictions of first-degree murder and possession

of a firearm by a person convicted of domestic violence.  **AFFIRMED.**


        Karmen Anderson, Des Moines, for appellant.

        Brenna Bird, Attorney General, and Zachary Miller and Israel Kodiaga,

Assistant Attorneys General, for appellee.


        Heard by Tabor, P.J., Buller, J., and Doyle, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2023).

**DOYLE, Senior Judge.**

Mark Mash appeals after a jury found him guilty of first-degree murder and possession of a firearm by a person convicted of domestic violence. He challenges the jury instructions, the denial of his motion for mistrial, and the admissibility of text message evidence. He also contends that his first-degree-murder conviction is unsupported by substantial evidence and contrary to the weight of the evidence. Finally, Mash contends trial counsel's deficient representation rises to the level of structural error, and in the alternative, he asks us to adopt a plain-error standard to reach the errors his counsel failed to preserve. We affirm Mash's convictions.

**I. Backgrounds Facts and Proceedings.**

In December 2020, Mash and his twenty-year-old nephew, Jakob, engaged in an escalating argument that began when Mash accused Jakob of stealing several bottles of coolant from his property. Hours of accusatory text messages, angry phone calls, and scare tactics ended in an exchange of gunfire. Jakob was struck in the forehead by one of Mash's bullets and was declared dead when emergency responders arrived at the scene.

Although there are claims that Mash "bullied" his nephew throughout his life,[1] the roots of the feud took hold that fall while Jakob worked for Mash. According to Mash, Jakob failed to show up on time so Mash "ended up getting rid of him." Mash also believed that Jakob was tampering with his equipment and

---

[1] Mash denies he bullied Jakob. In his words, he "picked on" Jakob to "toughen[] him up." Mash explained this is the same behavior that his brothers subjected him to when they would beat him up "at least once or twice a week" as he was growing up. In his view, this behavior is part of a normal brotherly relationship. Mash also testified, "in my family, we usually don't call the cops. We just show up and beat on each other. It's the way we were—that's the way we grew up."

stealing from his property. This led to the deterioration of the relationship between uncle and nephew as the two "didn't really talk much" after that.

Things came to a head on December 20, when Mash noticed bottles of coolant missing from his property and suspected Jakob of stealing them. At 10:20 p.m., he sent Jakob a text message asking if Jakob was "gonna bring back the stuff that you guys took." For the next few hours, the two exchanged hostile text messages in which they insulted, challenged, and threatened each other.

During this exchange of messages, Jakob's friend, Jackson, drove Jakob to Mash's home in rural Dallas County. They slowly drove back and forth on the road in front of Mash's house before parking the vehicle down the road and turning off the headlights. In response, Mash lit clusters of firecrackers and threw them out his back door.

Hearing what they believed were gunshots from a semiautomatic weapon, Jackson drove to Jakob's home, where Jakob retrieved his rifle and put it in the backseat. At about 1:20 a.m., Jackson drove slowly past Mash's property again. Jackson testified that after hearing what he believed were two gunshots fired at close range, Jakob grabbed the rifle from the backseat, leaned out the window, and fired a shot.

Mash claims that he was outside retrieving a soda from his vehicle when Jackson and Jakob returned. Unsure who had been driving past his residence or how many people were inside the vehicle, Mash testified that he brought a rifle with him for "protection." He claims that he was standing near the open back-passenger door of his vehicle when a bullet passed three or four inches from his head and shattered the window. Mash testified that he shut the door and either

ducked down or dove to take cover behind the house. At the same time, with the soda in his left hand, Mash lifted the rifle waist-high in his right hand and shot three or four rounds toward the street.

After Jakob fired the rifle, Jackson began driving away. He then noticed Jakob slumped over with blood trickling from his forehead. Jackson stopped the vehicle and called 911. Around that time, Mash sent Jakob more text messages, including one that said: "I win."

Emergency responders arrived and pronounced Jakob dead at the scene. An expert in forensic pathology determined that Jakob was killed by a single gunshot wound to the head.

After exchanging gunfire, Mash made several phone calls. During an eleven-minute phone call with his father, Mash stated that someone shot at his property; Mash did not say that someone shot at him or that he shot back. Mash then called one of his brothers and said that "someone"—Jakob, he thought—"shot his windows out of his vehicle." That brother testified that Mash "wasn't really upset" during the phone call. And at 2:06 a.m., about thirty minutes after shooting Jakob, Mash called the non-emergency police dispatch number to report that his nephew was shooting at his premises. The dispatcher perceived Mash as calm while reporting the shooting. Mash did not disclose that he had fired a weapon, and he denied having one.

The State charged Mash with first-degree murder and possession of a firearm by a person convicted of domestic abuse. A jury found Mash guilty of both charges, and the court sentenced Mash to life imprisonment without the possibility of parole and a five-year term of imprisonment, which it ran concurrently.

**II. Jury Instructions.**

Mash first contends the court's instructions to the jury on his use of a deadly weapon and justification misstate the law. We review challenges to jury instructions for correction of errors at law. *See State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018). We do not look at an erroneous instruction in isolation; we review the instructions all together. *See id.* We reverse an erroneous instruction only when prejudice results. *See id.* at 138. Prejudice occurs when the instructions mislead the jury or materially misstate the law. *See id.*

We begin with Mash's challenge to the court's instruction about dangerous weapons. Instruction No. 26 states, "Malice aforethought may be inferred from Mark Daniel Mash's use of a dangerous weapon." Mash complains that it was improper to instruct the jury that it could infer malice aforethought from his use of a deadly weapon because he was justified in using it to defend himself.

The supreme court explained the reason for allowing an inference of malice from the defendant's use of deadly weapon in *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017).

> [I]t is often impossible for a jury to determine a defendant's state of mind without the aid of inference. By instructing the jury that it may infer malice from the use of a dangerous weapon, courts present the jury with a straightforward example of how the State might prove the defendant's culpable state of mind. The inference, which the jury is permitted but never required to make, exists because a rational juror could infer that one who uses a dangerous weapon intends to cause physical harm, and even to kill. If unjustified and unexcused, causing physical harm or death is a wrongful act, and therefore the intent to do these things is a state of mind that would constitute malice aforethought. Thus, the jury may infer the defendant acted with malice aforethought by using a dangerous weapon, the natural consequence of which is physical harm or death.

*Green*, 896 N.W.2d at 780 (internal quotation marks and citations omitted). As Mash notes, the court also identified "circumstances where it would not be appropriate to infer malice." *Id.* One circumstance is when "the defendant had adequate provocation or fear of imminent bodily harm to use the weapon. The inference would be inappropriate because the defendant's state of mind was not malicious, but instead was justified or excused." *Id.* (internal citation omitted). Mash, like the defendant in *Green*, argues that the malice inference is not appropriate because he was justified in using deadly force. We reject his argument for the same reason the court rejected it in *Green*.

Mash and the State presented the jury with two conflicting theories of the case. The State claims Mash was acting with malice when he shot and killed Jakob, while Mash claims he was justified in using deadly force to protect himself. As in *Green*, the instructions on both theories accurately state the law and there was substantial evidence presented at trial in support of them. *Id.* If the jury rejected Mash's justification defense, it could—but was not required to—infer Mash acted with malice aforethought from his use of a deadly weapon. *See id.* Instruction No. 46 explains Mash's justification defense and the State's burden to prove beyond a reasonable doubt that Mash's use of force was not justified. Instruction No. 21, the marshalling instruction for first-degree murder, also requires the State to prove that Mash's actions were not justified. The jury was left to decide between the two competing theories and found the State met its burden. We find no error.

We turn then to Mash's challenge to the court's instructions on his justification defense as it relates to illegal activity. In Instruction No. 48, the court

informed the jury that Mash's use of force was not justified if it found the State proved any of the following beyond a reasonable doubt:

> 1. Mark Daniel Mash did not have reasonable a belief that it was necessary to use force to prevent an injury or loss.
> 2. Mark Daniel Mash used unreasonable force under the circumstances.
> 3. Mark Daniel Mash was engaged in an illegal activity in the place where he used force, he made no effort to retreat, and retreat was a reasonable alternative to using force.

Mash argued "that the appropriate definition of 'illegal activity' would require a nexus between that activity and the reason for the use of force." On that basis, he asked the court to modify the third element in Instruction No. 48 to instead state, "Mark Daniel Mash was engaged in illegal activity germane to the use of force that made it necessary to respond with 'Deadly Force.'"

The prosecutor resisted the language Mash suggested, arguing it was unnecessary. But the prosecutor also argued that instructing the jury using Mash's proposed language was unlikely to change the result:

> I think . . . it would be unbelievable to argue that the defendant's illegal possession . . . of a firearm was not germane to the fact that he discharged it at somebody. Again, if the defendant doesn't illegally possess a firearm, then we're not here on a homicide case. So I'm not sure it makes an extraordinary difference in this case. But the State does not believe that that germane language is necessary.

The supreme court reached the same conclusion in rejecting a similarly worded instruction on similar facts in *State v. Lorenzo Baltazar*, 935 N.W.2d 862, 871 (Iowa 2019).

> It is Baltazar's position the implied duty to retreat involves only illegal activities germane to the use of force. *See* [Iowa Code] § 704.1(3). Baltazar suggests aggressively threatening or assaulting a recipient of violence are such qualifying activities. He claims, however, his possession of a handgun, legal or otherwise, is irrelevant to the justification issue. We disagree with this assertion.

> Baltazar did not simply possess a handgun in an irrelevant way. He possessed a handgun in a way that is germane to the use of force. Baltazar's own testimony revealed he sought to confront Mercado and he further admitted using the handgun as assurance to talk with Mercado and to get his attention. That handgun, which Baltazar later fired, caused Mercado's death. Even assuming the implied duty to retreat involves only illegal activities germane to the use of force, Baltazar's possession of the handgun was directly related to the shooting death of Mercado. In this case, Baltazar's possession of the handgun was germane to the use of deadly force.

*Lorenzo Baltazar*, 935 N.W.2d at 871. Furthermore, the supreme court recently considered an instruction identical to the one given here. *State v. Ellison*, 985 N.W.2d 473, 477-78 (Iowa 2023). Despite the "syntactical awkwardness" of the instruction's subparagraph 3, the court in *Ellison* found "it correctly stated the law" and concluded there was no error in the giving of the instruction. *Id.* at 479. Accordingly, we find no error.

**III. Mistrial.**

Mash next challenges the denial of his motion for mistrial after a State witness violated the ruling granting his motion in limine. We review the denial of a motion for mistrial for an abuse of discretion. *See State v. Plain*, 898 N.W.2d 801, 811 (Iowa 2017). We "only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *Id.* at 816.

The court's decision to deny mistrial and instead offer a cautionary instruction is entitled to broad deference. *See id.* at 815. Usually, a curative instruction is enough to enable the jury to complete its task without being improperly influenced by otherwise prejudicial testimony. *See State v. Williamson*, 570 N.W.2d 770, 771 (Iowa 1997). A mistrial is necessary only when the evidence was so prejudicial its effect on the jury could not be erased by an admonition. *See*

*State v. Jackson*, 587 N.W.2d 764, 766 (Iowa 1998). "Cautionary instructions are sufficient to mitigate the prejudicial impact of inadmissible evidence 'in all but the most extreme cases.'" *Plain*, 898 N.W.2d at 815 (citation omitted).

Mash moved for a mistrial on the third day of the seven-day trial after the State called his uncle, Martin Seibert, to testify. Seibert, a former Des Moines police officer, was also Mash's landlord. Seibert testified that Mash showed him his .22 semiautomatic rifle when Seibert stopped at the house about three weeks before the shooting.

> Q. Were you aware at that point if he had a domestic abuse conviction in his past? A. No, ma'am, I did not.
> Q. If you had known that, would you have advised him that he's not allowed to possess that weapon? A. Yes. In fact, we had that conversation before when he spent, I believe, nine months in prison.

Mash objected to the statement as violating the ruling granting his motion in limine. Part of that motion sought, generally, to prevent the State from offering hearsay statements contained in the minutes of testimony or any report into evidence. Mash then specified that "the State should be precluded from offering any testimony by Martin Seibert that [Mash] allegedly told him 'he wasn't going back to prison.'"

During a conference outside the presence of the jury, Mash's attorney explained why a mistrial was necessary:

> That very specific prison comment was directly addressed in my motion in limine. Not just a generic, not bring up criminal history. I specifically wrote in the motion in limine, Martin Seibert can't say Mark's been to prison. That was—I don't even believe it was objected to. But it was granted in the motion in limine.
> The way the answer came from the question makes it sound like Mark did nine months in prison for that domestic assault. The domestic assault is an element of Count II. It's actually a

misdemeanor crime of domestic violence. I don't know that the jury necessarily knows what gets you to prison and what doesn't, but I think the general public infers if you go to prison, it's probably a felony.

And so then if we try to establish this was a misdemeanor crime of violence, then I think the question for the jury becomes, well, what did he go to prison on. I don't know how to rehabilitate this without opening the door to so many other things that have been excluded.

This is an extreme case. It's not a blip that was failed to be redacted out of a video that just kind of went through. I mean, this was just the elephant in the room. It was so obvious when it happened because it was nonresponsive to the question. I was so shocked, there was a pause before I objected. And then we approached and we took a break for lunch.

There's just no way to come back from this, and it makes it sound like Mark went to prison for nine months—not even just prison, he had to specify the time—for a domestic violence conviction that he was specifically told not to talk about. I don't see how there's any way to get around the prejudice Mark has—is subjected to at this point.

We would ask for a mistrial.

The prosecutor resisted Mash's motion. She instead asked the court to caution the jury:

We would ask that the court give a cautionary instruction, stating that the testimony has been stricken from the record and the jury is instructed to disregard any reference to the defendant spending time in prison. I think that mitigates it.

We are in day two of evidence. We have at least three more this week, and at least one to two more next week. A single isolated incident, when you look at the entirety of the evidence that's going to be presented, is not necessarily enough to cause such an extreme prejudice to the defendant that the Court should grant a mistrial.

. . . .

I would note that this—this particular statement wasn't actually directly addressed in the motion in limine. She did talk about testimony from Martin Seibert, but that was actually, specifically, that the defendant told him he was going to kill himself because he wasn't going back to prison. That's the statement that was in the motion in limine in Paragraph 6.

I also looked at Paragraph 3, talking about alleged prior bad acts. And that refers to Martin knowing about a prior assault that Mark did with a baseball bat on someone named Bob. And in the

section about—in No. 4 about prior convictions, the defense actually doesn't talk about Martin Seibert.

So I would just say that that's actually not—that specific statement that he made—obviously we didn't intend for him to bring that up—but is actually not specifically listed in the motion in limine. Not that that makes it any better. I'm just saying it's not actually listed. I just wanted to point that out.

The court found that Seibert did not intentionally make statements in violation of its ruling. It instructed the jury to disregard Seibert's statement and noted that the jury would be instructed to disregard any evidence stricken from the record, which it found was curative. The court also offered to give a curative instruction at the end of trial if Mash requested it.

The trial court based its ruling on *State v. Lawrence*, 559 N.W.2d 292 (Iowa Ct. App. 1996). In *Lawrence*, the trial court granted the defendant's motion in limine, in which he sought to exclude testimony about his recent release from prison. 559 N.W.2d at 293. But during trial, two witnesses made brief references:

During the State's direct examination of William, inquiry was made into his phone conversations with police during the hostage situation. In responding, William mentioned "an officer was talking, something about prison . . . ." Defense counsel objected and the prosecutor rephrased his question. The record reflects that outside the presence of the jury defense counsel requested the statement be stricken from the record. Counsel then withdrew his request to have the jury instructed to disregard the statement in order to avoid calling further attention to the remark.

During the direct examination of Deputy Sheriff Kelly Sutten, the deputy was asked about the substance of his second phone conversation with defendant. The deputy responded, "He advised me that he wasn't going to go back to the joint—." Defense counsel objected and moved for a mistrial based on the cumulative effect of the testimony of William and the deputy. The motion was denied. Defense counsel again opted not to have the court issue a cautionary instruction to the jury. With the approval of defense counsel, the jury was informed by the court that the answer had been stricken from the record and to disregard the statement.

*Id.* at 293-94.  On appeal, this court found the curative actions taken by the trial court were adequate and the defendant did not meet his burden of showing an abuse of discretion.  *Id.* at 295.

The supreme court has identified the factors the court must consider in determining whether a cautionary instruction is enough to mitigate the prejudicial impact of inadmissible evidence.  *See Plain*, 898 N.W.2d at 816.  The first factor "is whether the 'defendant [can] combat the evidence without compounding the prejudice.'"  *Id.* (alteration in original) (citation omitted).  The court must also consider "how extensive the evidence is and the promptness with which it was addressed."  *Id.*  Finally, it must assess the likelihood of prejudice, bearing in mind that "the stronger the State's evidence of [the defendant's] guilt is, the less prejudicial the effect of the challenged testimony."  *Id.*

The district court acted within its discretion by taking curative measures rather than granting Mash a mistrial.  "[W]hen evidence admitted contrary to a prior court ruling [is] promptly stricken and the jury admonished to disregard it, a mistrial may be granted only when the matter forbidden is so prejudicial that its effect upon the jury could not be erased by the trial court's admonition."  *State v. Huser*, 894 N.W.2d 472, 498 (Iowa 2017).  A brief reference to Mash spending nine months in prison on the third day of a seven-day trial for first-degree murder was unlikely to have much effect on the jury.  *See, e.g.*, *id.* at 499-500 (finding three improper questions during a fourteen-day trial with forty-five witnesses was not "so flagrantly prejudicial that the district court abused its discretion in denying a mistrial").  Mash has not met his burden of showing the district court abused its discretion.

**IV. Evidentiary Issues.**

Mash contends the court erred by admitting evidence of text messages he exchanged with others, which comprise exhibits 81 through 85. He notes that with one exception, none of the people he communicated with testified at trial. Mash claims the evidence is irrelevant, hearsay, and prejudicial.

Mash sought to exclude the text message exchanges in his motion in limine, arguing they were irrelevant and hearsay. The State argued the messages were relevant to show Mash's state of mind and fell under the hearsay exception as statements made by a party opponent—Mash himself. The district court denied the motion but allowed Mash the option to renew his objections during trial. Mash did so regarding exhibits 82 and 83. Thus, the State concedes that Mash preserved error on his relevancy and hearsay claims about exhibits 82 and 83. But because Mash never objected to any exhibit on prior-bad-acts grounds, he failed to preserve error on that claim. *See State v. Rutledge*, 600 N.W.2d 324, 325 (Iowa 1999) ("Nothing is more basic in the law of appeal and error than the axiom that a party cannot sing a song to us that was not first sung in trial court.").

We generally review evidentiary rulings for an abuse of discretion. *See State v. Tucker*, 982 N.W.2d 645, 652 (Iowa 2022). An abuse of discretion occurs when the trial court exercises its discretion on untenable grounds or to an extent clearly unreasonable. *See State v. Tipton*, 897 N.W.2d 653, 690 (Iowa 2017).

But the district court has no discretion to admit hearsay evidence that does not fall under one of the enumerated exceptions. *See State v. Thompson*, 982 N.W.2d 116, 121 (Iowa 2022). Nor can it deny the admissibility of hearsay evidence that falls within one of those exceptions. *See id.* For those reasons, we

review rulings on the admissibility of hearsay evidence for correction of errors at law. *See State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021).

With all evidentiary rulings, we only reverse if prejudice occurred. *See Tipton*, 897 N.W.2d at 690. But we presume hearsay is prejudicial "unless the record affirmatively establishes otherwise." *Thompson*, 982 N.W.2d at 121 (citation omitted).

Mash contends the text messages were not relevant and included highly prejudicial. We disagree. Mash claimed he only fired his rifle in self-defense, but the text messages he exchanged on the night of the shooting indicate a different state of mind. And the question is not whether the evidence is prejudicial, it is whether the evidence is unfairly prejudicial. "Evidence is unfairly prejudicial if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action that may cause a jury to base its decision on something other than the established propositions in the case." *State v. Shanahan*, 712 N.W.2d 121, 137 (Iowa 2006) (cleaned up). The evidence at issue was relevant to whether Mash was justified or acted with malice aforethought and did not unfairly prejudice him.

**V. Sufficiency of the Evidence.**

Mash challenges the sufficiency of the evidence supporting his first-degree-murder conviction. He contends the State failed to prove beyond a reasonable doubt that his actions were not justified. He also contends there is insufficient evidence showing he acted with deliberation and malice aforethought.

We review the sufficiency of the evidence for correction of errors at law. *See State v. Lacey*, 968 N.W.2d 792, 800 (Iowa 2021). We are "highly deferential"

to the verdict and affirm if it is supported by substantial evidence. *Id.* Evidence is substantial if it may convince a rational person of the defendant's guilt beyond a reasonable doubt. *See id.* In making this determination, we view the evidence and all reasonable inferences that can be drawn from it in the light most favorable to the State. *See id.* The question is whether the evidence supports the finding the court made, not whether it would support a different finding. *See id.*

As we noted when discussing the jury instructions, there was evidence supporting both the State's theory that Mash acted with deliberation and malice aforethought in shooting Jakob and Mash's theory that he only fired at Jakob because he reasonably believed it was necessary for self-defense. The determination of Mash's guilt came down to which evidence the jury believed. It was free to reject some evidence and credit other evidence. *See State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006). It could believe some of a witness's testimony while rejecting other parts. *See State v. Shorter*, 945 N.W.2d 1, 10 (Iowa 2020). "Likewise, the jury is free to credit portions of both sides' evidence and conclude the real story is somewhere in the middle." *Id.* It is not the appellate court's job to resolve conflicts in the evidence, pass on witness credibility, determine whether explanations are plausible, or weigh the evidence; "such matters are for the jury." *State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006) (citation omitted).

Viewing the evidence in the light most favorable to the State, we agree that the evidence is enough to convince a rational factfinder of Mash's guilt beyond a reasonable doubt.

**VI. Weight of the Evidence.**

Mash repackages his sufficiency-of-the-evidence argument by alleging the verdict is contrary to the weight of the evidence on the same bases, challenging the State's proof of premeditation and malice aforethought. We review this claim for an abuse of discretion. *See State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). The question before us is whether the defendant has shown the trial court abused its discretion in ruling on the motion for new trial. *See State v. Reeves*, 670 N.W.2d 199, 202-03 (Iowa 2003). An abuse of discretion has occurred if the "court exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *See id.* at 202.

To find a verdict is contrary to the weight of the evidence, the court must find "a greater amount of credible evidence supports one side of an issue or cause than the other." *Id.* (citation omitted). The weight-of-the-evidence analysis is much broader than the sufficiency-of-the-evidence analysis. *Nitcher*, 720 N.W.2d at 559. Unlike in determining the sufficiency of the evidence, a court assessing a motion for new trial examines the weight of the evidence and weighs the credibility of the complaining witnesses. *See Powers v. State*, 911 N.W.2d 774, 782 (Iowa 2018). Although the district court makes its own credibility determinations under a weight-of-the-evidence standard, it "may grant a motion for new trial based on the weight of the evidence 'only if more evidence supports the alternative verdict as opposed to the verdict rendered.'" *State v. Ernst*, 954 N.W.2d 50, 60 (Iowa 2021) (citation omitted). The court grants a motion for new trial only in exceptional circumstances. *See Ary*, 877 N.W.2d at 705.

This is not one of the "exceptional cases in which the evidence preponderates heavily against the verdict." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998) (citation omitted). Because Mash fails to show the district court abused its discretion in denying his motion for new trial, we affirm.

**VII. Cumulative Error.**

Finally, Mash contends that his constitutional right to counsel was violated because his trial counsel failed to provide effective assistance. He claims that counsel's failings rise to the level of "structural error." But Iowa Code section 814.7 (2021) prohibits us from deciding claims of ineffective assistance of counsel on direct appeal. *See State v. Tucker*, 959 N.W.2d 140, 159 (Iowa 2021). Thus, we do not address the individual claims of ineffective assistance or the structural-error claim that stems from them.

In the alternative, Mash asks us to analyze his claim under a plain-error doctrine. We cannot. Our supreme court has "repeatedly rejected the plain error review," *State v. Treptow*, 960 N.W.2d 98, 109 (Iowa 2021), and we cannot overrule its precedent. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014).

**AFFIRMED.**