# IN THE COURT OF APPEALS OF IOWA

No. 19-2050
Filed May 26, 2021

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**BARBARA LEE PASA,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Monroe County, Shawn Showers, Judge.

Barbara Pasa appeals her convictions for first-degree murder and first-degree arson. **CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Christopher A. Clausen of Clausen Law Office, Ames, for appellant.

Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Greer and Schumacher. JJ.

**GREER, Judge.**

Firefighters found Tim Pasa deceased in the bedroom of his home engulfed in flames. Tim was Barbara Pasa's husband of eighteen years. And the property burning was the family home they shared with their two teenage children. Fast forward past the investigation, Barbara was charged and found guilty of first-degree murder and first-degree arson following a jury trial in September 2019. After the verdict was rendered, the district court sentenced Barbara to life in prison without the possibility of parole on the first-degree-murder charge, plus twenty-five years for first-degree arson. Now, Barbara appeals the district court's denial of her motion for new trial, arguing the jury verdict was contrary to the weight of the evidence. Next, she claims the district court erred by denying her motions for judgment of acquittal. She also claims the district court erred in sentencing her to a mandatory minimum term of incarceration, requiring her to serve 70% of her sentence for first-degree arson before becoming eligible for work release or parole. *See* Iowa Code § 902.12(5) (2019).[1] Lastly, she claims ineffective assistance of trial counsel but acknowledges the record lacks support for these claims and asks they be preserved for postconviction relief (PCR).

---

[1] Iowa Code section 902.12(5) provides:

> A person serving a sentence for a conviction for arson in the first degree in violation of section 712.2 that *occurs on or after July 1, 2019*, shall be denied parole or work release until the person has served between one-half and seven-tenths of the maximum . . . term of the person's sentence as determined under section 901.11, subsection 5.

(Emphasis added.)

**I. Factual Background.**

Barbara and Tim's two teenage children left the family house the morning of May 5, 2018, to catch a bus departing at 6:30 a.m. for a soccer tournament. O.P., their son, did not see Tim that morning. But the evening before, Tim told O.P. he wanted to get away from Barbara and would not be attending the tournament. That morning, Barbara told the children Tim said he was not feeling well and was sleeping. This left Barbara and Tim alone in the house together. The time Barbara left the home was disputed. In an interview with law enforcement, Barbara claimed she left the house by 7:00 a.m., but a neighbor testified she drove past the Pasa home at roughly 7:22 a.m. and saw Barbara's car in the driveway. What is undisputed is around 7:30 a.m., multiple neighbors noticed smoke emanating from a bedroom window on the east side of the Pasa's home. The fire was reported to a 911 operator at 7:33 a.m.

Police officers and firefighting personnel arrived minutes later and entered the home. They discovered Tim's severely burned body lying on the right side of the bed in the master bedroom. When they reached him, it was obvious Tim was deceased. Per protocol, an investigation into the fire and a forensic autopsy of Tim's body commenced.

The fire investigation began when Vern Milburn, Assistant Chief of the Centerville Fire Department and state certified fire investigator, arrived on the scene. He provided testimony for the State at trial. After entering the Pasa home Assistant Chief Milburn noticed several oddities he later described as "red flags." First, he did not hear any smoke detectors going off in the home. Neighbors who arrived before him also did not hear smoke detectors. However, Assistant Chief

Milburn discovered two smoke detectors. One on the west side of the home had its "door" opened rendering it inoperable. Another smoke detector in the hall leading to the master bedroom was still on the wall, but melted, with the batteries nearby on the floor. In Assistant Chief Milburn's experience, typically when a smoke detector melts "the battery is . . . inside . . . it's not visible. Once it melts, it usually just all kind of comes in a big glob and stays together, and it all falls down together. They usually don't separate."

Next, Assistant Chief Milburn noted the highest concentration of fire damage was in the master bedroom, specifically at the headboard on the right side of the bed where Tim's body was found.

> In this situation with this bed, we looked at depth of char. So if you look at the headboard, I know it's hard to see, but if you look at the headboard, you can see on the right side of it all the spindles and everything are completely burnt up. They're completely gone.
> As you work your way back to the left, the spindles start getting—the depth that they get—they're deep in char, but as they start coming back to the left, then they start coming back to more and more to them. So that's kind of what we look at that kind of brings us back to where the highest concentration of fire probably was.

In trying to locate a fire source, Assistant Chief Milburn observed a candle on the floor by the left side of the bed in the master bedroom. During the course of the investigation, Barbara told investigators, friends, and family (sometimes unprompted) that she believed the candle was the source of the fire, explaining she had placed it on the left bedside table to cover the smell of dog urine in the bedroom the morning of the fire.[2] Assistant Chief Milburn noted the candle was

---

[2] Barbara explained that the twelve-year-old family dog urinated on the carpeting that morning. Barbara used Febreze, an odor inhibitor product, to mask the smell but also lit a "three wick" candle and placed it on the side table located on the left side of the bed.

on its side but the bottom was not blackened from smoke or fire. Additionally, there was a white round spot the size of the candle bottom on the carpet next to the candle. This suggested to him that the candle was not on its side when the fire started.

Assistant Chief Milburn also spoke to Barbara the day of the fire. She said she left the house around 6:50 a.m. that morning. During that interview, Assistant Chief Milburn thought Barbara's demeanor was strangely calm and emotionless given the loss of her husband. He considered this one of the "red flag" concerns and noted "[w]hen we talked about red flags, in my years in the fire service, I've had a lot of people that lose their pet in a house fire that is a lot more upset than what I was getting from Barbara." Given these "red flags," Assistant Chief Milburn contacted Special Agent David Linkletter from the Iowa Department of Public Safety, State Fire Marshal Division, to help investigate.

Bringing years of fire analysis experience to the scene, Special Agent Linkletter offered his expertise to develop the cause and origin of the fire. He also testified for the State at trial. Special Agent Linkletter corroborated Assistant Chief Milburn's findings about the two smoke detectors being inoperable. But he mainly focused on the master bedroom, as it was already established the fire was centralized there.[3] He determined most of the fire damage existed on the right side of the bed where Tim's body was found when compared to the left side. The burn patterns established the flames directly hit the right side of the wall and right

---

[3] Actual fire damage was contained to the master bedroom, although there was smoke damage throughout the home. Special Agent Linkletter determined the fire originated in the master bedroom and ruled out all other areas inside and outside the home as the origin of the fire.

side of the headboard. Special Agent Linkletter also ruled out the candle as the source of the fire:

> Q. If a candle were placed on the floor right side up in that circular area with the flame lit, could it have been a possible ignition source? Did you consider it? A. Yes. Absolutely.
> Q. Did you rule it out? A. Yes.
> Q. Why? A. Earlier I said the burn patterns can tell us a lot about what burns and also what doesn't burn. And in this case, at least the circumstance with the candle, we have a wooden structure for the box springs that is very, very close to that area burning on the floor and the candle. If we had an event that started there that really contributed to this fire, it would have burned in that area for a much longer time to cause more heat damage to its immediate surroundings. It wouldn't have just, you know, traveled from one spot to another. Fire typically stays where it is, and it's going to consume the things around it. And it's going to take some time, so it's going to generate some heat. And so other things while that fire is growing are also going to sustain damage as well.

Testing done on the flooring of the bedroom was inconclusive as to the presence of any accelerants. Special Agent Linkletter provided extensive testimony at trial, which boiled down to these conclusions:

> Q. So after looking at the scene, getting lab results back from the [Department of Criminal Investigations] . . . looking at everything, considering everything here, were you able to determine the cause of the fire . . . on May 5, 2018? A. We determined the fire originated on the mattress, on the right side of the mattress, based on the burn patterns that we had. It was very apparent to us that that's where the main source of the fire was. That's where the fire burned for the longest period of time, and that's where the fire extended from.
> Q. So no accidental sources; right? A. That's correct.
> Q. Was this a set fire, in your opinion? A. It appeared to us the fire was intentionally set using some sort of open flame in one way or another.
> Q. And the origin of the fire is in the right side of the mattress? A. Correct.

On cross-examination Barbara's counsel presented a different theory on the origin and cause of the fire, again centered on the candle as the source. Special Agent Linkletter addressed that theory:

Q. But there was a candle that was— A. That's correct.

Q. —an inch and a half from the bed railing, wasn't there? A. That's absolutely correct.

Q. So if the candle that's an inch and a half from the bed rail catches a blanket or a quilt that might be hanging over the edge on fire, that could be a source of the fire, couldn't it? A. The burn patterns don't suggest that.

Q. Well, they don't suggest that because the fire couldn't grow as fast on this corner of the bed, could it, because it doesn't have as much oxygen? A. I think if we had significant fire there, we would have had more patterns to suggest that.

In short, Special Agent Linkletter rejected Barbara's repeated suggestion that the candle caused the fire. He determined the fire was not accidental, it was set on purpose.

We now turn to the investigation into the cause of Tim's death. Dr. Dennis Klein, the state medical examiner, performed the forensic autopsy on Tim. The goal of the autopsy was to determine the manner and cause of death.[4] Dr. Klein had assistance from Dr. William Anderson, a forensic toxicologist, in reaching his conclusion that Tim's cause of death was acute propofol intoxication and manner of death was homicide. Dr. Klein quickly ruled out the fire as a cause of death; there was no soot or smoke in Tim's mouth or windpipe and there were negligible levels of carbon monoxide in his blood. These findings showed Tim died before the fire. Other than extensive thermal injuries, there were no other signs of physical injury on Tim's body. Natural disease was also ruled out. So Dr. Klein sent a sample of Tim's blood to the toxicology lab to test for any drugs in his system that could have caused death. At first he ordered an "expanded panel, which

---

[4] Dr. Klein testified cause of death means "any disease, injury, any poisoning, or any abnormality that ultimately leads to a person's death." Manner of death means "a category of death that helps explain how the death occurred . . . Those include natural, accident, suicide, homicide, and undetermined."

includes many of the drugs of abuse that we see in society as well as a number of prescription-type drugs . . . also drugs that can cause death." Dr. Klein explained this was an "inclusive test" because he did not know what to look for. The first toxicology panel showed nothing unusual that could explain Tim's death. At this point Dr. Klein was stumped, so he consulted with the toxicologist, Dr. Anderson. They decided to test specifically for the nonnarcotic drug propofol.

> [O]ver the course of the discussion, we always look for what potential would the person or some other person have access to that would be beyond what our expanded panel is.
> So we had information that Mr. Pasa's wife was a surgical nurse or had access to surgical, so that opened up some possibilities. And including in that were some specific drugs, *one of them including propofol* as well as a couple other medicines that were found—or medicine bottles that were found in the home. We added those to a testing to look specifically for those drugs.

(Emphasis added.)

Dr. Klein explained the nature of propofol and why it must be carefully administered in a medical setting:

> So propofol is a medicine that's only given intravenously, so that means you need to stick a needle into a vein, and it needs to be infused. It's a medicine that's used usually by anesthesiologists, so these are doctors who put people to sleep for surgeries, and *it's a drug that that has to be given in a controlled setting.* And what I mean by that, you really need to be in a medical setting that's prepared for surgery so that you can provide assistance for the person's breathing, and if they run into problems, you have IV access. *Because it's a drug that will cause problems to people's blood pressure and breathing if not having these other resources available.*[5]

---

[5] In a story familiar to many, pop singer Michael Jackson died "because of a fatal cocktail of medications in his system, most notably an excessive amount of the surgical anesthetic propofol." Jen Chaney, *The full story on Michael Jackson's tragic death* (June 14, 2016), https://www.washingtonpost.com/ entertainment/books/the-full-story-on-michael-jacksons-tragic-death/2016/06/14/ 5d9f74ee-3181-11e6-8758 d58e76e11b12_story.html.

(Emphasis added.) The new testing revealed Tim had 0.18 micrograms per milliliter of propofol in his blood. This was a low level; Dr. Klein said, "In people undergoing anesthesia, usually it's on the order of [five] micrograms per milliliter while they're asleep, while they're undergoing surgery." In other words, the amount found in Tim's blood was far less than anesthesiologists use to put a patient to sleep for surgery and was not a lethal level. Still, Dr. Klein found the presence of propofol in Tim's blood significant:

> [I]t's very rare for us to find it in our patient population because it tends to be a drug that's in a medical setting.
> Only usually physicians or nurses really have access to propofol. The fact that we have a person who's outside of a medical setting with propofol, no matter what the concentration is, in the absence of some other explanation for cause of death, is very significant.
> Part of the reason for doing the autopsy and doing all these other tests is to exclude all other possibilities, and when the only possible cause of death left is propofol, which we know can have a wide range of concentrations in people who have died from propofol, that really leads us very strongly to conclude that this is the cause of death.

Dr. Klein also explained that the low level of propofol in Tim's blood at the time of the autopsy was not necessarily indicative of the level when he died.

> So propofol eliminates very quickly, within minutes. So it's possible that his level could have been quite a bit higher at the time of injection and then he becomes what's called hypoxic, meaning not enough oxygen, because he's not breathing enough. So that would give time for that drug to be eliminated and then he would die several minutes or a period of time after that injection, but the damage is already done without someone there to provide ventilation, so stick a tube down his throat to provide ventilation for him to survive.

But Barbara argued a joint trial stipulation entered with the State, containing an opinion of Dr. Anderson, contradicted Dr. Klein's opinions. And as Barbara told the jury, "So . . . when the attorney general make a big deal of the fact that the

autopsy is performed days later, their own expert says, 'We don't expect the propofol level to go down after he's dead.'"

To address the difficulties in administrating the drug, both the State and Barbara, attacking from different vantage points, directed the jury to consider an important question: how could she have administered the fatal dose intravenously without resistance from Tim, a much larger person?  There was evidence that a large-gauge needle was necessary to inject propofol, and Barbara argued there was no physical way she could have injected the amount necessary to induce sleep and ultimately kill Tim.  Dr. Klein testified, "I'm trying to figure out how does someone get propofol into them, and so I wanted to know is there some other drug that could have been used to cause Tim to be at least unconscious or at least submissive to the point that propofol could be injected."  While Dr. Klein did not have a conclusive answer, he identified insulin as a possible substance that could have rendered Tim unconscious before being injected with propofol.  Barbara was a diabetic, and insulin needles were all over the Pasa home and in her vehicle.  According to Dr. Klein, because insulin needles are small and "[i]t can just be injected just in the skin without even—it would feel like a mosquito bite, and that could be injected and someone could become unconscious from low glucose—low sugar very quickly."  Still, Tim's blood tests did not detect insulin or drugs of sedation other than propofol, but Dr. Klein agreed this did not mean insulin or sedation drugs were not administered.  Because of the time it took to rule out other causes of death, Dr. Klein believed it was possible other substances "could have all dissipated by the time we got [the results]."

On cross-examination, Dr. Klein agreed he could not "rule out" the possibility that a combination of Tim's blood-pressure medication[6] and propofol could have lowered his blood pressure to a fatal level. He also agreed people sometimes use propofol recreationally to help them sleep or to produce a sense of euphoria.[7] Tying the propofol theory back to the fire, Dr. Klein agreed it was unlikely Tim could have injected himself with the drug and also started the fire. Overall, Dr. Klein's testimony demonstrated he firmly believed acute propofol intoxication was the cause of death and the manner of death was homicide.

As noted, Dr. Klein decided to test for propofol given Barbara's access to the drug as a surgical circulating nurse at the local hospital. Dustin Bozwell, a nurse anesthetist who worked with Barbara, testified about hospital procedure and staff access to propofol. First, he explained "wasting" procedures, meaning how leftover drugs are disposed of post-surgery. There are different procedures depending on a drugs classification as a narcotic or nonnarcotic. Narcotic drugs are highly regulated and kept in double locked boxes separate from nonnarcotics. If there are leftover narcotics after a surgery, the amount wasted is first recorded by the nurse anesthetist. Then a registered nurse inspects the wasted narcotics to verify the record is correct before signing off. This process is described as a "two-party system." Propofol is classified as a nonnarcotic, non-controlled drug not subject to the narcotic procedures. Bozwell described the wasting procedure for nonnarcotics at trial:

---

[6] Tim had a slightly high but non-fatal level of amlodipine, a prescribed blood-pressure medication, in his blood at the time of the autopsy.
[7] As we discuss later, no evidence suggested Tim used propofol or any other drugs recreationally.

Q. So narcotics have their own system, a two-party system, for wasting?  A. Correct.

Q. With respect to nonnarcotics, what happens with leftovers? A. With those drugs, then, we have two waste disposals at our disposal.  One is a red box, which we put all what we call "sharps," which would be needles or anything that would have some method of cutting a person.  So if it's a glass vial or if it's a surgical instrument that is sharp, anything that is sharp goes into the sharp box.  All other liquid medications go into a black disposal box that is right next to the red box.

Q. We'll talk about those boxes here in a little bit.  Is that system, though, the nonnarcotic waste system, is that a two-party system, or is that a single party?  A. That's just us.  Whenever we're finished with whatever drug—when we know that we're finished with that, we just throw it into that black box.

Q. There's no accounting for how much is left?  A. No.

The lack of accounting procedures for propofol was confirmed by the testimony of other hospital staff members; the nurse anesthetist would record how much propofol was wasted before it was tossed in the red or black bins.  Other than that sole record, there was no accounting for the discarded propofol.

The red and black bins for wasted nonnarcotic drugs were in the two main operating rooms at the hospital.  The bins were not emptied until they became full, at which point a circulating nurse would seal them off and wheel them to a maintenance closet for disposal.  Barbara was a circulating nurse and agreed removing the bins was one of her job duties.  But she claimed she never removed the bins herself.  Bozwell confirmed Barbara's access to propofol from the nonnarcotic waste bins, as well as surgical items like sterile needles and syringes.  He also agreed Barbara was not the only hospital employee who had access to the nonnarcotic waste bins.  On cross-examination, Bozwell estimated it may have taken up to a full twenty milliliter bottle of propofol to put a man of Tim's size to

sleep; but it was not uncommon for a full twenty milliliter syringe of propofol to be wasted and disposed of in the operating room bins.

Other circumstantial evidence was presented at trial. First, the State postured a financial motive for Barbara to kill Tim. Other testimony detailed her behavior after Tim's death. No one disputed that Tim's and Barbara's marriage was on the rocks by May 2018. Both Tim and Barbara told others about the likelihood of a future divorce. Over several interactions in April 2018, Barbara told her friend Sonja Carson she did not think the marriage would last through the summer. She told Sonja and other friends at a dinner that she "fucking hated Tim"; she also said she "knew how to get rid of somebody if she wanted to" although she "could have been" joking according to Sonja. Bethany Ahnen, who considered Barbara one of her closest friends, testified that Barbara told her a week before Tim's death that she wanted the marriage to end. When Bethany advised Barbara to get a divorce, she responded that she could not afford a divorce. Barbara's behavior around the time of the fire and Tim's death was also a topic of much discussion at the trial. Multiple friends, coworkers, investigators, and family members, including Barbara and Tim's son testified about her behavior and demeanor. Almost every one of these witnesses described her as acting unemotional, matter of fact, and stoic. They all considered this unusual given Tim's death. Barbara's niece was at the house the morning of the fire and described Barbara acting upset and resistant when she found out Tim's body would undergo an autopsy. Barbara confirmed as much during her testimony, but claimed she was only upset because she didn't want his body "any more cut up."

Barbara admitted at trial that she and Tim had financial difficulties and were six months behind on their home mortgage payments. She discussed increasing Tim's life insurance policy, which she described as a mutual decision, from $50,000 to $200,000 during an open enrollment period in October 2017. The policy went into effect in February 2018. Barbara was the beneficiary of the policy, and she explained the policy was increased mainly so she could afford to cover the home mortgage if anything happened to Tim. She also said she had tried to increase her own life insurance policy during the 2017 open enrollment period but was denied, so increasing Tim's policy amount was the only way to increase coverage for the family. Barbara maintained she and Tim decided to increase his insurance together and that he participated in making the changes by giving Barbara information from his employer insurance account.

At trial Barbara attacked the evidence against her and postured a different explanation for Tim's death. Barbara's version and theories surrounding the events of the fire contrast sharply with that of witnesses and investigators. Barbara contended the more plausible theory as to causation of Tim's death was the interaction of propofol with his blood-pressure medication. She points to Tim's training as an EMT to suggest he could have handled his own injection and likely was using the drug recreationally. She also presented evidence that a propofol injection requires use of a large-gauge needle, causes burning pain,[8] and suggested it would take more than seconds to inject a fatal dose. She tied this

---

[8] Testimony from Dr. Klein and other medical professionals confirmed that propofol injections produce a burning effect and is often given with the drug lidocaine to mitigate the effect. No lidocaine was found in Tim's blood.

back to her theory that it was not possible that she could have injected Tim without his knowledge or resistance, considering he was much bigger than she. While the State argued she likely injected insulin or muscle relaxers to knock him out for the propofol injection, Barbara countered with the lack of toxicology evidence of any other substance in Tim's system.

While investigators believed Barbara was the supplier of the propofol, she offered another possibility to produce juror doubt, urging their next door neighbor, a nurse anesthetist, supplied Tim with the propofol. As a nurse anesthetist, the neighbor also had access to propofol. He and Barbara exchanged text messages at 5:30 a.m. the morning of the fire; because his garage faced the Pasa's bathroom Barbara knew when he was leaving his house and would occasionally text him asking if he was heading to work at the hospital early. Such was the case the morning of the fire. Although not preregistered, the neighbor purportedly went to a training seminar but left early and returned to the neighborhood after his wife alerted him about the fire. The front doors of the house were found open by other neighbors on the scene right after the fire began. Further, before the public had knowledge of the presence of propofol, this neighbor mentioned to an investigator that he heard a "rumor" at the hospital where he and Barbara both worked about the possibility the drug was involved in Tim's death. Likewise, this neighbor testified at trial about his knowledge of the characteristics and administration of propofol.

As for the source of the fire, Barbara stood by the candle theory. She surmised that Tim either moved the candle from the left bedside table where she had placed it to the floor to access his Kindle, or possibly knocked the candle over

on accident. She argued the candle made contact with the bedding either by the dog jumping on the bed or by Tim moving the covers, setting the bed ablaze. To explain the burn patterns and more extensive damage on the right side of the bed, Barbara suggested a guitar case found on the upper left-hand corner of the bed inhibited the supply of oxygen on the left side but that the fire began to rage as it moved to the right side where Tim's body was found. As for the disabled fire alarms, Barbara explained Tim did that because she had been cooking the night before and burned some food. And she showed investigators a burnt finger during the interviews.

To create a timeline of Barbara's movements, Special Agent Don Schnitker obtained Barbara's cellphone as part of the investigation and created a searchable digital record of the phone's contents. He noted that Barbara sent a text to her daughter at 7:08 a.m. on May 5, stating she would be a little late to the soccer tournament.[9] The records showed she made no attempt to contact Tim that morning even after learning about the fire. When Special Agent Schnitker confronted Barbara about this in an interview she offered no explanation. The phone records also showed that between 7:36[10] and 7:49 a.m., Barbara missed at least five phone calls from concerned friends and neighbors who heard about the fire. She began returning calls at 7:51 a.m. and later explained she missed the calls because of poor cell phone coverage. Investigators also learned Barbara made a cash withdrawal from a local bank ATM that morning; a video recording

---

[9] Barbara changed her timeline during trial testimony, claiming she must have left the house at 7:08 given her text to her daughter.
[10] By 7:36 a.m. neighbors, police officers, and firefighters were on the scene at the Pasa home.

from the bank showed her making the withdrawal around 7:25 a.m.[11]  The bank manager who pulled the footage for investigators estimated the drive from the Pasa home to the bank takes around five minutes, give or take a few minutes.  And the footage from the bank, which is roughly a five-minute drive from the Pasa home, showed Barbara was there around 7:25 a.m.  Special Agent Schnitker testified there was no evidence Tim used propofol or any drugs recreationally; no evidence he had enemies or anyone with a motive to kill him; and no history of violence of any kind.

After the investigation concluded, Barbara was charged with first-degree murder and first-degree arson in June 2018.  Trial began on September 17, 2019, and lasted one week.  After deliberating for roughly three hours, the jury delivered a verdict finding Barbara guilty of both charges.

**II. Standard of Review and Error Preservation.**

Barbara first claims the district court erred in denying her motions for judgment of acquittal, arguing the State presented insufficient evidence for the jury to convict.  The State agrees she preserved error.  "We review challenges to the sufficiency of [the] evidence for correction of errors at law."  *State v. Albright*, 925 N.W.2d 144, 150 (Iowa 2019).

Next, Barbara claims the district court erred in denying her motion for a new trial on the basis the jury's verdict was contrary to the weight of the evidence.  The State does not contest she preserved error.  We review a district court's denial of

---

[11] The video footage of Barbara at the bank is timestamped at 7:38 a.m., but the bank manager who pulled the footage testified at trial that the time stamp was twelve or thirteen minutes fast.

a motion for new trial for abuse of discretion. *State v. Reeves*, 670 N.W.2d 199, 202 (Iowa 2003). "Trial courts have broad discretion in passing on motions for new trial." *State v. Atley*, 564 N.W.2d 817, 821 (Iowa 1997). Abuse of discretion occurs when the district court "exercised its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" *Id.* (citation omitted). "On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of whether the verdict is against the weight of the evidence." *Reeves*, 670 N.W.2d at 203.

Third, Barbara and the State agree that her alleged act of first-degree arson occurred on May 5, 2018, before the July 1, 2019 amendment to Iowa Code section 902.12 creating the mandatory minimum requirements. See Iowa Acts ch. 140, § 39. Both parties agree imposing a 70% mandatory minimum here violates ex post facto principles[12] and that Barbara's sentence should be remanded to the district court to eliminate the mandatory minimum requirement. A claim of an illegal sentence is normally reviewed for correction of errors at law. *State v. Hoeck*, 843 N.W.2d 67, 70 (Iowa 2014). But a constitutional challenge to an illegal sentence is reviewed de novo. *State v. Lyle*, 854 N.W.2d 378, 382 (Iowa 2014).

Finally, Barbara claims she received ineffective assistance from her trial counsel. Her claims relate to alleged failures of trial counsel in investigating and presenting her case. Barbara admits she "refers to matters which are not clear within the record." She asks that we preserve her ineffective-assistance claims if

---

[12] S*ee* U.S. Const. art. I, § 10, cl. 1; Iowa Const. art. I, § 21.

we find the record insufficient to resolve them. The State agrees the ineffective-assistance claims should be preserved for PCR proceedings.

**III. Analysis.**

**A. Sufficiency of the Evidence.**

We start with Barbara's claim that the district court erred in denying her motions for judgment of acquittal. She argues the State presented insufficient evidence for the jury to convict her of first-degree murder and first-degree arson. "In reviewing challenges to the sufficiency of evidence supporting a guilty verdict, courts consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *State v. Reed*, 875 N.W.2d 693, 704 (Iowa 2016) (citation omitted). "A jury verdict finding of guilt will not be disturbed if there is substantial evidence to support the finding." *State v. Robinson*, 859 N.W.2d 464, 467 (Iowa 2015). Evidence is substantial if it would "convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *Id.* (citation omitted).

We first address the first-degree-murder conviction. The State had the burden to prove beyond a reasonable doubt that Barbara, having malice aforethought, did willfully, deliberately, and with premeditation kill Tim. *See* Iowa Code §§ 707.1, 707.2(1)(a) (2018). But from a juror's view, what the State lacked in direct evidence it more than compensated with substantial circumstantial evidence of Barbara's guilt. *See State v. Huser*, 894 N.W.2d 472, 491 (Iowa 2017) (noting direct and circumstantial evidence are equally probative). First, Dr. Klein was clear and unwavering in his belief that Tim's death was a homicide caused by acute propofol intoxication. A jury could find that Tim was dead before the fire

began. Likewise, the autopsy confirmed the carbon monoxide levels in Tim's blood were negligible and no soot or smoke was found in his lungs. There was also no evidence of any injuries causing death, other than the severe burns covering his body. Although Tim had an enlarged heart and took medication to treat high blood pressure, Dr. Klein ruled out a heart attack or other natural causes of death. In Dr. Klein's opinion, the presence of propofol in Tim's blood was highly suspicious and the only explanation for the cause of death. And it was not disputed that Barbara had regular access to propofol as a circulating nurse at the hospital, while Tim did not. The jury was free to reject Barbara's theory that Tim injected himself with propofol for recreational use, particularly because there was no history of drug use shown or an explanation of how Tim would have obtained propofol. As for the theory that the neighbor-nurse anesthetist might have provided the drug to Tim, the jury was able to evaluate the neighbor's creditability as he testified at trial. *See State v. Dudley*, 856 N.W.2d 668, 676 (Iowa 2014) ("Our system of justice vests the jury with the function of evaluating a witness's credibility."). While Barbara identified theories for the cause of Tim's death as well, the State offered plausible counter responses with testimony from experts in their fields. "The jury is not required to accept the defendant's version of the events." *State v. Helm*, 504 N.W.2d 142, 146 (Iowa Ct. App. 1996); *accord State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012) ("Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." (alteration in original) (citation omitted)).

Barbara argues the level of propofol found in Tim's blood was not enough to put him to sleep, let alone cause death. This is true; the level of propofol in

Tim's blood was low. That said, Dr. Klein testified the level of propofol in Tim's blood by the time of toxicology tests was not necessarily indicative of the level when he was injected. Barbara counters this by pointing to a joint stipulation offered at trial in which Dr. Anderson, the toxicologist consulted by Dr. Klein, stated, "The concentration of [p]ropofol in a person's blood is not expected to decrease after death." But Dr. Anderson's statement was not inconsistent with Dr. Klein's report and testimony, in which he said the concentration of propofol in a person's blood would dissipate rapidly *after injection* and before death.

> So propofol eliminates very quickly, within minutes. So it's possible that *his level could have been quite a bit higher at the time of injection* and then he becomes what's called hypoxic, meaning not enough oxygen, because he's not breathing enough. So that would give time for that drug to be eliminated *and then he would die several minutes or a period of time after that injection.* . . .

(Emphasis added.)

Next, Barbara questions how she could have overpowered Tim and injected the propofol into his veins. Dr. Klein offered theories as to how Tim could have been rendered unconscious before the propofol injection, including an injection of insulin or a sedative drug. Ultimately the State did not have evidence of any other substance in Tim's blood that could have rendered him unconscious, although Dr. Klein said insulin or sedative drugs could have dissipated from Tim's blood by the time he ordered toxicology testing. In other words, he believed the lack of insulin or sedatives in Tim's blood did not mean they were never present.

Other pieces of evidence bolstered the State's case. Together with Dr. Klein's testimony on the autopsy and toxicology test results, the State raised Barbara's financial motive to kill Tim because of money problems and a crumbling

marriage. *See State v. Blair*, 347 N.W.2d 416, 421 (1984) (deliberation and premeditation can be shown by evidence of a motive). Further, Barbara's timeline of events on the morning of May 5 was inconsistent; neighbors saw her vehicle at the house as late as 7:22 a.m., contradicting her claim that she left by or shortly after 7:00 a.m. Because the fire was raging by 7:33 a.m., if Barbara left later than she offered, that left only minutes for the injection of propofol and the start of the fire to occur.

Pointing to reasonable human behavior, the State discussed Barbara's post-fire actions. After learning of the fire, and knowing Tim was ill or asleep in the home, Barbara never called to check on him. Barbara never explained why she did not even attempt to contact Tim. Lastly, friends, coworkers, and family, including her own son, testified about Barbara's strange lack of emotion after Tim's death and found it suspicious.

Ultimately, the jury concluded Tim was murdered and that Barbara was the killer. We find the evidence, viewed in the light most favorable to the State, is substantial and more than enough to "convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt." *Robinson*, 859 N.W.2d at 467. We affirm Barbara's conviction for first-degree murder.

Barbara also challenges her conviction for first-degree arson. Arson is statutorily defined as:

> Causing a fire or explosion, or placing any burning or combustible material, or any incendiary or explosive device or material, in or near any property with the intent to destroy or damage such property, or with the knowledge that such property will probably be destroyed or damaged . . . whether or not any such property is actually destroyed or damaged.

Iowa Code § 712.1. Arson in the first degree occurs "when the presence of one or more persons can be reasonably anticipated in or near the property which is the subject of the arson . . . ." *Id.* § 712.2. Here, Barbara again presents the candle theory. As we discussed above, her theory that a candle found on the left side of the master bedroom was the cause and origin of the fire was rejected and refuted by Special Agent Linkletter, an expert in fire investigations. He concluded the fire originated on the right side of the bed based on burn patterns and was caused intentionally by some sort of direct flame on the bedding. This matches the testimony of Assistant Chief Milburn, the first state-certified fire investigator on the scene who contacted Special Agent Linkletter after noting multiple "red flags" in the Pasa home, including smoke detectors rendered inoperable. Viewing the evidence in the light most favorable to the State, we find substantial evidence supported the jury's finding that Barbara set the fire and is guilty of first-degree arson. We affirm her convictions.

**B. Weight of the Evidence.**

Barbara next claims the district court abused its discretion denying her motion for new trial, arguing the jury verdict is contrary to the weight of the evidence. "Iowa Rule of Criminal Procedure 2.24(2)(b)(6) [(2019)] permits a district court to grant a motion for new trial when a verdict is contrary to the weight of the evidence." *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). "A verdict is contrary to the weight of the evidence only when 'a greater amount of credible evidence supports one side of an issue or cause than the other.'" *Id.* (citation omitted). The analysis is broader than the sufficiency-of-the-evidence analysis "in that it involves questions of credibility and refers to a determination that more credible evidence

supports one side than the other." *State v. Nitcher*, 720 N.W.2d 547, 559 (Iowa 2006). Yet it is "also more stringent than the sufficiency of the evidence standard in that it allows the court to grant a motion for new trial only if more evidence supports the alternative verdict as opposed to the verdict rendered." *Ary*, 877 N.W.2d at 706. "[A] district court may invoke its power to grant a new trial on the ground the verdict was contrary to the weight of the evidence only in the extraordinary case in which the evidence preponderates heavily against the verdict rendered." *Id.*

In support of her claim the jury verdict was contrary to the weight of the evidence, Barbara offers the same arguments she makes in her sufficiency-of-the-evidence claim. For the same reasons we found her arguments on the sufficiency of the evidence claim unconvincing, we reject her weight-of-the-evidence claim. We find the district court did not abuse its substantial discretion in denying her motion for a new trial. The district court could, and did, find the greater amount of credible evidence weighed heavily in favor of the jury's conclusion that Barbara, having malice aforethought, did willfully, deliberately, and with premeditation kill her husband, Tim. Similarly, the greater amount of credible evidence supports the jury's conclusion that the fire at the Pasa home was set intentionally by Barbara, the only person other than Tim in the house the morning of May 5. This is not a rare and "extraordinary case where the evidence preponderates heavily against the verdict." *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006).

**C. Sentencing Error.**

Barbara claims the district court erred in sentencing her to a mandatory minimum for first-degree arson requiring her to serve 70% of her twenty-five-year

sentence before becoming eligible for work release or parole under Iowa Code section 902.12(5). Section 902.12(5) provides:

> A person serving a sentence for a conviction for arson in the first degree in violation of section 712.2 that *occurs on or after July 1, 2019,* shall be denied parole or work release until the person has served between one-half and seven-tenths of the maximum term of the person's sentence as determined under section 901.11, subsection 5.

(Emphasis added.) The State agrees that Barbara did not commit an arson on or after July 1, 2019, so the statute does not apply to her conduct. So to avoid an ex post facto application, the State urges, "The case should be remanded for entrance of an order eliminating the mandatory minimum. No new sentencing hearing is necessary." We remand with directions to eliminate the mandatory minimum portion of the sentencing order. *See State v. Smith-Berry*, No. 19-0839, 2020 WL 2988410, at *4 (Iowa Ct. App. June 3, 2020); *State v. Brown*, No. 18-1988, 2020 WL 1879686, at *6–7 (Iowa Ct. App. Apr. 15, 2020).

**D. Ineffective-Assistance-of-Counsel Claims.**

Both Barbara and the State agree on this point—the evidence is not sufficient to address Barbara's ineffective-assistance-of-counsel claims. We agree and preserve these claims for a PCR proceeding. *See State v. Zacarias*, No. 19-0838, 2021 WL 1583820, at *10 (Iowa, Apr. 23, 2021) (preserving defendant's ineffective-assistance-of-counsel claims for a PCR proceeding to allow an adequate record to be made and allow the attorney the opportunity to respond to the claims).

**IV. Conclusion.**

We affirm Barbara's convictions for first-degree murder and first-degree

arson. We remand only for entrance of an order eliminating the mandatory minimum portion of her sentence requiring her to serve 70% of her arson sentence before eligibility for parole or work release. We preserve Barbara's ineffective-assistance-of-counsel claims for PCR proceedings.

**CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**