# IN THE COURT OF APPEALS OF IOWA

No. 21-0784
Filed April 12, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ANDREW JOSEPH HARRISON,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller, Judge.

A criminal defendant appeals his conviction for second-degree sexual abuse. **AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Vidhya K. Reddy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Thomas J. Ogden, Assistant Attorney General, for appellee.

Heard by Vaitheswaran, P.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

Andrew Harrison appeals his conviction for second-degree sexual abuse, raising five arguments. He claims there is insufficient evidence to support his conviction. He argues the victim's out-of-court statements should have been excluded from trial because the statements were hearsay. He contends the court improperly denied his attempt to strike a juror for cause. He asserts the court gave an improper jury instruction pertaining to the victim's absence from trial. Finally, he alleges the court improperly allowed some statements from an expert witness. We find the conviction is supported by substantial evidence. The court properly admitted the victim's statements and denied Harrison's motion to strike the juror for cause. Harrison did not preserve his objection to the challenged jury instruction. The expert testimony was admissible. We affirm.

## I. Background Facts and Proceedings

Andrew Harrison lived in the same apartment building as C.T. and her three children—two sons, ages twelve and nine, and a daughter, H.T., who was three years old. C.T. generally utilized daycare for the children while she worked. But her job required her to work one evening a week and every-other weekend, times when her daycare was not open. On those days, C.T. left the children with friends and neighbors.

One of those neighbors, Harrison, offered to babysit. C.T. testified that Harrison would sometimes watch H.T. alone at his apartment while the two older children were left unattended at C.T.'s apartment. Harrison justified this location decision as giving the older children "a break" from their sister.

On July 15, 2018, C.T. dropped H.T. off at Harrison's apartment around nine in the morning because she had to work. Her sons were with other family members. C.T. returned to pick up H.T. around six-thirty in the evening. C.T., H.T., and the two other children then ran some errands, including dropping an item off at a friend's home.

During the drive to the friend's home, the family chatted, a "typical catching up on their day conversation." Then, unprompted, H.T. stated, "I played with Drew's dick today."[1] C.T. testified that the older children had taught H.T. the word "dick," and that she was not supposed to use the word. The older children laughed at H.T.'s statement and C.T. chastised them. C.T. sent the older children into the friend's home once they arrived and walked over to H.T.'s side of the vehicle. C.T. testified that H.T. was very quiet, timid, and would not make eye contact—behavior that was highly unusual for her.

C.T. testified that she continued to undertake the planned errands because she did not want to make the children think something was wrong. The family arrived at a store. While there, the older children went to the restroom. C.T. used the opportunity to speak to H.T. C.T. testified that she asked H.T. if Harrison had touched her anywhere else. H.T. responded by saying he had also "licked her down there," gesturing to her genital area.

C.T. then dropped the older children off with a family friend and took H.T. to the hospital. An examination by a pediatrician did not find any acute injuries. The pediatrician did not examine H.T.'s genitals, explaining that such examination was

---

[1] C.T. testified that the children refer to Harrison as Drew.

best left to someone more specifically trained. The hospital referred H.T. to the Child Protection Center at St. Luke's Hospital. C.T. was told not to change H.T., bathe her, or allow her to wipe after using the restroom prior to the examination.

H.T. arrived at the Child Protection Center the next day around one in the afternoon. While there, staff performed two swabs for DNA. One swab covered the area around H.T.'s vagina. The second covered the area around her anus, including the bottom part of her buttocks. A buccal swab was also taken to obtain a known sample of H.T.'s DNA. The swabs were sent to the Division of Criminal Investigation (DCI) lab for testing. Police obtained a buccal swab from Harrison after the execution of a search warrant.

A DCI criminalist, Ryan Petruccelli, testified at trial about the tests performed on the swabs and H.T.'s underwear. After shining a blacklight on H.T.'s underwear, Petruccelli identified four areas that fluoresced. He screened the underwear for seminal fluid via the AP presumptive test, which was negative. He then performed the P30 test, which suggested high levels of a protein common in seminal fluid. The protein is also common in urine. That test was faintly positive. As a result, Petruccelli performed a sperm search, which was negative.

Petruccelli also performed DNA tests. H.T.'s DNA was found on both sets of swabs and her underwear. DNA analysis identified Harrison's DNA on the inside of H.T.'s underwear.[2] Harrison's and H.T.'s DNA were found at a ratio of about 1:5, meaning Harrison's DNA was about five times more common than H.T.'s.

---

[2] The record is somewhat unclear on the implication of that test. Petruccelli testified that the chance of DNA randomly matching that profile was 1 in 3.19 million. However, he then clarified that there are "approximately thirty zeroes" in 3.19 million.

Petruccelli testified that the ratio indicated the DNA likely came from a fluid. Harrison's DNA was also identified in the anal swab.[3] The vaginal swab contained DNA that likely came from a male, but was inconclusive.

Petruccelli testified to several aspects of DNA that can complicate analysis. First, he makes no determination of how the DNA gets on the items he tests. He testified that DNA can be moved via transfer. He also testified that the amount of DNA left somewhere is not indicative of the amount of contact that occurred. Instead, individuals and substances shed DNA at different rates.

Trial began on March 30, 2021. H.T. did not testify, having been found not competent to testify by the judge prior to trial. Harrison objected to the mother's testimony involving the statements H.T. made to her on July 15, which the court overruled. During jury selection, one juror indicated he would have a "tough time" with this case because the juror had young children. Harrison sought to strike the juror for cause, but the court denied the motion. Harrison used a peremptory strike on that juror. An expert witness, Dr. Meidlinger, testified for the State. Some of his testimony discussed "grooming" behaviors of sexual offenders.

The jury found Harrison guilty of second-degree sexual abuse.[4] Harrison now appeals.

**II.     Hearsay Statements**

Harrison challenges the admissibility of two statements H.T. made to her mother. He claims both are inadmissible hearsay. In the first statement, H.T. told her mother, "I played with Drew's dick today." In the second statement, H.T. said,

---

[3] The chance of DNA randomly matching that profile was about 1 in 1.4 quadrillion.
[4] This offense was enhanced to a class "A" felony due to a previous conviction.

he had also "licked her down there," and gestured to her genitals. Hearsay—an out of court statement used to prove the truth of the matter asserted—is generally inadmissible unless an exclusion or exception applies. *See* Iowa Rs. Evid. 5.801(c); 5.802. "We review hearsay rulings for correction of errors at law and will reverse the admission of hearsay evidence as prejudicial unless the contrary is shown." *State v. Dudley*, 856 N.W.2d 668, 674 (Iowa 2014).

### A. Excited Utterance

The district court ruled both of H.T.'s statements were admissible pursuant to the excited utterance exception. *See* Iowa R. Evid. 5.803(2) (defining an excited utterance as, "A statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"). To determine if that exception applies, we consider:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*State v. Atwood*, 602 N.W.2d 775, 782 (Iowa 1999). "The court must consider all the factors to determine if the statements are admissible." *Dudley*, 856 N.W.2d at 679.

Our supreme court has recently had an opportunity to address the excited utterance exception involving a child. *State v. Dessinger*, 958 N.W.2d 590, 601 (Iowa 2021) (collecting cases). In review of *Dessinger* and applying the *Atwood* factors, we conclude both challenged statements from H.T. qualify as excited utterances.

We first consider the time between the purported abuse and H.T.'s statements. It is not clear from the record the exact time of day the sexual abuse occurred. H.T. did not disclose the abuse until the evening when the family was running errands. But it is clear from the record that the abuse occurred on the same day as the child reported it. Harrison asserts the child could not be acting under the stress of the abuse because of the time gap. We reject that argument. A "[l]apse of time alone will not ordinarily preclude the application of the excited-utterance exception." *Atwood*, 602 N.W.2d at 782. "[S]tatements made hours and even days after the event have been admissible." *Dessinger*, 958 N.W.2d at 601. Moreover, "[t]he time-lapse allowed for statements by a child may be more likely to be on the high-end of the range permitted." *Id.* This is particularly true when the child makes the statements "to a parent or other safe adult, at the soonest possible time after the abuse occurred." *Dudley*, 856 N.W.2d at 680. H.T. made the first statement when the family started to generally discuss their day. That was likely her first opportunity to inform her mother of what happened. The time gap between the criminal act and the child's statement was short. We turn to the other factors.

The second *Atwood* factor concerns "the extent to which questioning elicited the statements that otherwise would not have been volunteered." 602 N.W.2d at 782. "A statement in response to questioning 'does not automatically disqualify it as an excited utterance.'" *Dessinger*, 958 N.W.2d at 602 (quoting *State v. Harper*, 770 N.W.2d 316, 320 (Iowa 2009)). "But, questions asked to children may be particularly suspect because they could be 'calculated to elicit information which would otherwise have been withheld.'" *Id.* (citation omitted). H.T.'s first statement

was spontaneously given—asking about a child's day is not likely to elicit a statement that they would not otherwise have made.

Her second statement was made after her mother inquired if Harrison "had touched her anywhere else."  Courts have upheld the admissibility of statements given in response to general questions.  *See, e.g.*, *id.* ("Asking a child 'what happened' does not seriously undercut application of the excited utterance exception if the child is still under stress from that event.").  But, when a child requires "more than one prompting question before [they] made the statements," the statement is less likely to constitute an excited utterance.  *Dudley*, 856 N.W.2d at 680.

We have also considered the age and condition of H.T., the characteristics of the event being described, and the subject matter of the statement.  We conclude that applying the *Atwood* factors leads to the conclusion that both statements of three-year-old H.T. qualify as excited utterances. The court properly admitted both statements.

## B.    Residual Hearsay

While the trial court admitted both statements under the excited utterance exception, we also address the State's argument that H.T.'s statements were alternatively admissible under the residual hearsay exception.  *See* Iowa R. Evid. 5.807.  We recognize this ground was not ruled upon by the district court.  Nevertheless, "[w]e consider the applicability of exceptions in criminal cases even when not urged at trial as there is no point in reversing a conviction when the evidence will be admissible at retrial in any event."  *Dessinger*, 958 N.W.2d at 599.  The residual hearsay exception is used "sparingly."  *State v. Liggins*, 978 N.W.2d

406, 431 (Iowa 2022). We examine the statement using five factors, all of which must be met: (1) trustworthiness, (2) materiality, (3) necessity, (4) service of the interest of justice, and (5) notice. *Id.*

"In evaluating trustworthiness, we may consider both the trustworthiness of the declarant and the credibility of the witness reporting the statement." *Id.* at 432. H.T.'s mother asked an open-ended, non-leading question. *See State v. Rojas*, 524 N.W.2d 659, 663 (Iowa 1994). H.T. responded by describing an action a three-year-old would not ordinarily know about, suggesting its credibility. The statement was not vague. *See Liggins*, 978 N.W.2d at 432. The statement was made soon after the event occurred. *See id.* (finding a comment made thirty years ago was not trustworthy). And nothing suggests improper motive by either H.T. or her mother.

Next, the statements were both material and necessary. Harrison was charged with second-degree sexual abuse. The State needed to prove a sex act occurred between Harrison and H.T. Her statements describing the acts are highly relevant to establishing a sex act occurred. It was also necessary. H.T. was determined to be not competent to testify. The only way the State could introduce her account of the abuse was via out-of-court statements to her mother. *See State v. Skahill*, 966 N.W.2d 1, 12 (Iowa 2021) ("On the issue of necessity, the key commonality between [two cases finding out-of-court statements were necessary] was that the most probative evidence, the victim's account of the alleged sexual abuse, would not have been presented to the jury simply by having the victim testify."). Her out-of-court statements were the most probative evidence available detailing her experiences.

Finally, Harrison had ample notice the State was seeking the admission of H.T.'s statements. The court ruled they were admissible in its order on a motion in limine prior to trial. Admitting the statements also promotes the interest of justice—"[t]he appropriate showing of reliability and necessity were made, and admitting the evidence advances the goal of truth-seeking expressed in Iowa Rule of Evidence 5.102." *State v. Neitzel*, 801 N.W.2d 612, 623 (Iowa 2011) (quoting *Rojas*, 524 N.W.2d at 663). We determine H.T.'s statements were also admissible under the residual hearsay exception.

## III.    Sufficiency of the Evidence

Harrison challenges the sufficiency of the evidence to support his conviction. In particular, he alleges there is insufficient evidence he committed a sex act with H.T.[5] We review such claims for correction of errors at law. *State v. Sandford*, 814 N.W.2d 611, 615 (Iowa 2012). We view all the evidence in the record in the light most favorable to the State. *Id.* We will uphold a verdict if it is supported by substantial evidence. *Id.* "Evidence is considered substantial if, when viewed in the light most favorable to the State, it can convince a rational jury

---

[5] The jury instructions informed the jury:
> Concerning element number 1 of Instruction No. 14 "sex act" means any sexual contact between two persons:
> 1. By penetration of the penis into the vagina or anus.
> 2. Between the mouth of one person and the genitals of another.
> 3. Between the genitals of person and the genitals or anus of another.
> 4. Between the finger or hand of one person and genitals of another person.
> 5. Or by the use of artificial sex organs or substitutes thereof in contact with the genitalia or anus.
> You may consider the type of contact and the circumstances surrounding it in deciding whether the contact was sexual in nature.

that the defendant is guilty beyond a reasonable doubt." *Id.* "Inherent in our standard of review of jury verdicts in criminal cases is the recognition that the jury [is] free to reject certain evidence, and credit other evidence." *Id.* (quoting *State v. Nitcher*, 720 N.W.2d 547, 556 (Iowa 2006)).

Substantial evidence supports the conviction. H.T.'s statements that she "played with Drew's dick" and that he performed oral sex on her indicate Harrison performed a sex act. H.T.'s comment about Harrison licking her genitals is particularly probative because it shows a knowledge of acts well beyond what an average three-year-old would know. Those statements were supported by the DNA evidence obtained from the inside of H.T.'s underwear and the anal swab. Petruccelli testified that the DNA found in H.T.'s underwear was at a concentration indicating that it likely came from a bodily fluid. And the presence of DNA *inside* her underwear cuts against Harrison's theory of DNA transferring from his apartment to her as she played during the day. Finally, the jury could properly consider Harrison's prior behavior, including isolating H.T. from her siblings while babysitting her in the past. While circumstantial, that conduct could be viewed as grooming behavior, in line with Dr. Meidlinger's testimony. Substantial evidence supports the verdict.

## IV. Motion to Strike Juror 20

Harrison claims the court wrongly denied his request to strike a juror for cause, forcing him to use a peremptory challenge. As a result, he contends the composition of the jury violated his right to an impartial jury. *See* U.S. Const. amend. VI, XIV; Iowa Const. art. I, §10. "We review the district court's rulings on

challenges to potential jurors for cause for abuse of discretion." *State v. Jonas*, 904 N.W.2d 566, 570 (Iowa 2017).

Because of the COVID-19 pandemic, jury selection began with a written questionnaire. In response to one question that asked if there was anything else the prospective juror wanted to tell the court, Juror 20 responded, "I have 3 young kids. Oldest is 12. I would do my best to remain impartial, but crimes of this nature really bother me." During voir dire, the juror expressed, "I don't know if I'm not going to draw comparisons to my own child and how I would feel, but as I would say, I would try to do my best" to follow the court's instructions. After being asked, "[A]re you saying right now you believe you have formed an opinion?" the juror responded, "I guess so. Yes." Harrison moved to strike the juror pursuant to Iowa Rule of Criminal Procedure 2.18(5)(k), which the court denied. Harrison subsequently asked for an additional peremptory strike, which the court also denied.

We need not decide whether the court abused its discretion when it denied Harrison's motion to strike because Harrison cannot demonstrate it resulted in prejudice. When a court wrongly denies a motion to strike, the defendant must establish prejudice occurred in order to warrant reversal. *State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993). "In the absence of some factual showing that this circumstance resulted in a juror being seated who was not impartial, the existence of prejudice is entirely speculative." *Id.* Actual prejudice is not needed, however, in certain circumstances.

> Specifically, in order to show prejudice when the district court improperly refuses to disqualify a potential juror under Iowa Rule of Criminal Procedure 2.18(5)(k) and thereby causes a defendant to

expend a peremptory challenge under rule 2.18(9), the defendant must specifically ask the court for an additional strike *of a particular juror* after his peremptory challenges have been exhausted. Where the defendant makes such a showing, prejudice will then be presumed.

*Jonas*, 904 N.W.2d at 583 (emphasis added).

Harrison did not ask to strike a specific juror. As a result, *Jonas* does not apply. *See id.* Still, he asks us to extend the holding of *Jonas* to this case and presume prejudice exists. We decline to do so. This court is not in a position to extend supreme court precedent, particularly when the supreme court has clearly ruled on the matter. *See State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990).

As a result, Harrison must make some factual showing that a biased juror was seated. *See Neuendorf*, 509 N.W.2d at 746. He fails to do so. On appeal, Harrison asserts that he would have struck Juror 28, who indicated the juror had family members who were victims of sexual abuse. However, he does not make any showing that Juror 28 was prejudiced against him or otherwise incapable of rendering a fair decision. *See Jonas*, 904 N.W.2d at 575. We determine there was no abuse of discretion by the trial court.

## V. Jury Instructions

Harrison contends the district court included an improper jury instruction informing the jurors that, "You may not consider the unavailability of H.T. for any purpose whatsoever." Harrison claims this was improper because it suggested that jury could not weigh H.T.'s credibility in light of her unsworn statements. We review jury instruction claims for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).

The State asserts this court need not address Harrison's claim because it is not preserved for our review. "We have repeatedly held that timely objection to jury instructions in criminal prosecutions is necessary in order to preserve any error thereon for appellate review." *State v. Davis*, 951 N.W.2d 8, 16 (Iowa 2020) (citation omitted). Those objections must be to the instructions "in their final form," and include "requesting instructions and voicing specific exception in the event they are refused." *Id.* (citation omitted).

Throughout the proceedings, counsel for both parties and the court discussed the propriety of several potential instructions on H.T.'s absence from trial. However, each discussion ended with the matter being tabled for another day. On the final day of trial, the district court informed Harrison's counsel that it denied their proposed instruction on the issue. Instead, the court proposed its own instruction. Immediately after the court informed defense counsel that it was denying counsel's proposed instruction, defense counsel informed the court, "We can use the Court's instruction." When asked again if there were any objections to the proposed instruction, defense counsel responded, "Your Honor, we're okay with that." And the court clarified one last time if defense counsel was agreeing to the instruction, with the following exchange:

> COUNTY ATTORNEY: I just want to make sure the defendant is actually requesting that instruction.
> THE COURT: Or agreeing to it.
> COUNTY ATTORNEY: Okay.
> THE COURT: You are agreeing to my instruction?
> DEFENSE COUNSEL: To that instruction, yes, Your Honor.
> THE COURT: Thank you.

Harrison's counsel never lodged a formal objection to the final instruction. This case is substantially analogous to *State v. Welch*, 507 N.W.2d 580 (Iowa

1993). Prior to the completion of the defendant's case, there was a short, informal discussion outside the presence of the jury between counsel and the court concerning the appropriateness of an instruction on aiding and abetting. *Welch*, 507 N.W.2d at 584. Later, the court presented the attorneys with a proposed set of instructions which included an aiding-and-abetting instruction. *Id.* At that time, defense counsel was given an opportunity to make any objections to the instructions on the record. *Id.* Defense counsel did not voice any objection to the instruction on aiding and abetting. *Id.* The court determined the informal discussion over jury instructions was insufficient to preserve error because of the lack of a specific objection to the instructions in their final form. *Id.*

As in *Welch*, defense counsel expressed their misgivings over various instructions leading up to and during trial. However, they did not specifically object to the instruction in its final form. Indeed, they informed the court three separate times that they accepted that instruction. In the absence of a specific objection to the instruction, error was not preserved. *See id.* Harrison had the obligation to specifically object to the instruction in its final form. He failed to do so. As a result, error is not preserved.

Harrison asks us to abandon our traditional rules of error preservation in this case. In particular, he asserts the district court had an affirmative duty to properly instruct the jury. In support of that proposition, Harrison cites to *Shams v. Hassan*, 905 N.W.2d 158 (Iowa 2017). In that case, our supreme court held that once a party proposes instructions on a matter that is relevant to the case, even if technically inaccurate, the proposal puts the district court on notice for the need of

a proper instruction on the issue. *Shams*, 905 N.W.2d at 169. Thus, the court's failure to include an instruction on the issue was error. *Id.*

However, *Hassan* is inapt. That case dealt with the omission of an instruction entirely. *Id.* In contrast, an instruction was given in this case. As *Hassan* explains, "Had the court advised the parties of a statute-of-limitations instruction that it intended to give, this would have immediately shifted the burden to the parties to identify specific objections to that instruction, as opposed to simply identifying the need for an instruction on" the issue. *Id.* This is not a case where an instruction was warranted but none was given.

## VI.    Expert Testimony

Harrison claims some testimony by the State's expert witness, Dr. Meidlinger, was not relevant and should have been excluded from trial. In particular, Dr. Meidlinger explained his experience performing evaluations of sexual offenders. After a relevance objection by Harrison that was overruled, Dr. Meidlinger testified,

> It entails everything that's involved in standard psychological evaluation, that is, review of relevant documents, interview with the person, having a complete psychological testing, and then putting that together to form of a report. The thing that is different in a sex offender report is that you also follow some actuarial information that's designed for the purpose of predicting their chance of re-offending.
> So the people want to know in sex offender evaluation is the person—this person re-offending, and what level of care, treatment, and incarceration do they need to—to rehabilitate them and protect the public?

On appeal, Harrison asserts the testimony was not relevant and unduly suggested to the jury that Harrison posed a risk of re-offending. We review evidentiary claims for an abuse of discretion. *Dudley,* 856 N.W.2d at 675.

First, we decline to consider Harrison's claim as it pertains to any unfair prejudice the testimony may have caused. Harrison's objection at trial was limited to relevance, not its prejudicial impact. Because the district court did not consider or rule on the prejudicial effect the testimony may have had, we cannot consider that portion of Harrison's claim. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).

Evidence must be relevant in order to be admissible at trial. Iowa R. Evid. 5.402. Evidence is relevant if it has any tendency to make a fact that is of consequence in determining the action more or less probable than it would be without the evidence. Iowa R. Evid. 5.401. In order to establish a particular witness can provide expert testimony, they must have some qualification "as an expert by knowledge, skill, experience, training, or education." Iowa R. Evid. 5.702.

Dr. Meidlinger's testimony was relevant to establishing his qualifications as an expert on grooming behaviors of sexual offenders. Dr. Meidlinger testified that he was a clinical psychiatrist. But that by itself may not make him qualified to discuss behaviors frequently seen in sex offenders. By testifying about his work performing psychological evaluations of sex offenders, Dr. Meidlinger was providing the basis for his knowledge about those kinds of behaviors. That he has spoken with and evaluated sexual offenders in the past makes his testimony about their behavior more credible because it establishes the origins of his knowledge. And explaining what an evaluation of a sex offender entails informs the jury about the type of information he would be obtaining from those offenders.

The testimony was relevant. The district court did not abuse its discretion in admitting it.

**AFFIRMED.**